## Milkman v. American Travellers
## Life Insurance Company

*Joseph Greitzer,* for plaintiff.
*Mary Catherine Roper* and *Alfred Putnam,* for defendants.

HERRON, *J.,* March 28, 2002—This opinion addresses a proposed global settlement of the claims asserted in this matter, as well as the claims presented in two related cases in California. These claims arise from the defendants' alleged fraud and other illegal conduct

related to the sale of certain long-term care and home health care insurance policies since 1989 and subsequent premium increases on those policies. In exchange for the dismissal of these claims, the defendants have offered members of the class the options of purchasing additional insurance or replacement insurance policies, applying the premiums already paid toward payment of long-term care or nursing care costs or retaining their current policies with protection against further substantial premium increases. The value of these benefits has been estimated at $34.7 million.

This case has generated a great deal of interest in the media[1] and among groups and agencies whose interests are purportedly aligned with those of the class.[2] Much of this attention has centered on perceived deficiencies in the proposed settlement and the supposed inadequacies of the relief it provides. The court initially shared some of these concerns and meticulously scrutinized the proposed settlement to determine if the benefits provided under it were as advantageous to the class as the parties contended. After a painstaking review of the proposed settlement using the seven-factor test mandated by the Pennsylvania Supreme Court, the court is convinced that

---

1. At least two articles have appeared in prominent newspapers. See Gene Meyer, Settlement's Choices Called Unacceptable; Insurance Offer Affected 33,000 in Missouri, Kansas, *Kan. City Star,* January 30, 2002, at C1; Ann Davis & Joseph T. Hallinan, Conseco's Class-action Settlement Proposal Is Criticized as Inadequate by Some Groups, *Wall Street Journal,* February 1, 2002, at B8.

2. In addition to two amicus curiae briefs filed by the office of the attorney general of the State of Texas and a February 12, 2002 letter signed by 34 state and commonwealth attorneys general, attorneys for the American Association of Retired Persons have entered appearances in this matter.

the settlement secures an adequate advantage for the class in relation to the rights being surrendered and that the settlement falls within the range of reasonableness for settling this action. This decision is based in large part on the significant risk inherent in the class's continued prosecution of this matter and the few class members expressing opposition to the proposed settlement, especially when compared to the large number of class members who have actively expressed an interest in the settlement. In addition, the court finds that class counsel's request for attorneys' fees and for incentive awards for the class representatives is appropriate.

## BACKGROUND

Defendant Conseco Senior Health Insurance Company is one of the leading providers of long-term care insurance in the United States. In January 1989, Conseco began issuing "guaranteed renewable" long-term care (LTC) and home health care (HHC) policies, with marketing for the policies directed primarily at senior citizens. Each of the policies includes the following language:

"We can change the renewal premium rates. We can only change them if they are changed for all policies in your state on this policy form. Notice of any change in rates will be sent at least 31 days in advance."

According to the class, the policies were developed as an "experimental" insurance product that was guaranteed as renewable, but gave no clear indication that the policy premiums would be increased. However, when the policies were sold, the class asserts, it was known that the policy premiums would have to be increased

substantially to ensure the viability of the policies as a whole.[3]

In 1996, Conseco was acquired by defendant American Travellers Life Insurance Company and assumed its current status as a wholly-owned subsidiary of American Travellers.[4] After this acquisition, Conseco continued to sell the policies. Around this time, the defendants allegedly decided that they would seek future increases in the policies' premiums, but did not inform either existing or potential policyholders of their intentions. The defendants also supposedly did not inform policy applicants that the "renewable" policies had an exceptionally high lapse rate.

When the defendants raised the policy premiums, they did so by way of form letters that stated that the increases were a result of either increased medical costs, higher claims rates or other cost increases, explanations that the class contends are false.[5] The defendants also "closed the book" on the policies by ceasing to sell new policies and limiting service to existing policyholders, allegedly

---

3. Individuals purchasing policies are referred to collectively as "policyholders."

4. American Travellers has also transacted business in Texas and California as ATL Life Insurance Company. ATL, American Travellers and Conseco are referred to collectively as the "defendants." Other companies that allegedly sold the policies include Conseco Life Insurance Company, Transport Life Insurance Company, J.C. Penney Life Insurance Company, Pioneer Life Insurance Company and other Conseco-owned companies.

5. As an example, plaintiff Irene Milkman applied for an LTC policy on May 19, 1990. In a letter dated July 13, 1999, the plaintiff was notified that the quarterly premiums for her policy would be increased 15 percent from $87.38 to $100.50. This letter claimed that the increases were necessary as a result of higher claims than expected.

sending the policies into what is known as a "death spiral."[6] As a result of the policy premium increases, many policyholders were forced to discontinue their insurance coverage and were unable to secure insurance coverage similar to that provided by the policies elsewhere because their advanced age made premiums unaffordable.

Based on these occurrences, cases similar to this one were subsequently initiated in California. The first of these cases was *Blau v. American Travellers,*[7] filed in California on March 8, 2000, brought by Janet Blau and Larry Blau. A second suit, *Lane v. American Travellers,*[8] was filed in California on March 24, 2000 by Alva Lane and Linda Pequegnat.[9]

On June 29, 2000, plaintiff Irene Milkman initiated the instant action. After a round of initial preliminary objections, the plaintiff filed an amended complaint, in which she asserted claims for violations of Pennsylvania's Unfair Trade Practices and Consumer Protection Law (UTPCPL),[10] negligent misrepresentation, fraud/intentional misrepresentation and constructive fraud.[11] At the same time, the courts hearing the *Lane* and *Blau* cases addressed numerous sets of demurrers and motions to

---

6. This term of art denotes a situation where the only premiums being received for a closed block of insurance policies is from existing policyholders and the issuing company will almost certainly require premium increases to pay the existing policyholders' claims.

7. Orange County Superior Court, case no. 00C03063.

8. San Diego County Superior Court, case no. GIF 745641.

9. The plaintiff and the named plaintiffs in the *Blau* and *Lane* actions are referred to collectively as the "class representatives."

10. 73 Pa.C.S. §§201-1 to 201-9.3.

11. A second round of preliminary objections was filed on February 26, 2001. These preliminary objections have never been addressed by the court.

strike. While the plaintiffs emerged victorious and unscathed from the preliminary battles in *Lane,* the Blau court sustained demurrers to the *Blau* plaintiffs' first two complaints, forcing the filing of a second amended complaint, to which a third set of challenges was presented. To promote judicial efficiency, the parties in this action and the *Blau* and *Lane* actions coordinated their considerable discovery efforts and negotiations with the defendants.[12]

On July 27, 2001, after extensive negotiations,[13] the plaintiff and the defendants filed a joint motion for preliminary approval of proposed class action settlement. The motion addressed class certification and a proposed settlement of the action under the following terms:

• The defendants would be released from liability for all claims members of the class have had, currently have or will have against the defendants, including the claims raised in the complaint.[14]

---

12. A fourth action, captioned *Weaver v. Conseco Senior Health Insurance Co.,* Harris County, Tex., civ. a. no. 2000-60408, filed on November 22, 2000, involved issues similar to those raised here and has been settled. Aff. of Allan Kanner in support of pl. mot. for award of att'y fees and costs ¶14. The status of a fifth action, *Rabalais v. Conseco Inc.,* Hinds County, Miss., civ. a. 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 CTV, filed on September 28, 2001, is unclear, and it does not appear that counsel for the plaintiff in *Rabalais* is working with class counsel. In addition, the office of the attorney general of the State of Texas initiated an action on July 31, 2001 captioned *State of Texas v. Conseco Senior Health,* Travis County, Tex., civ. no. GU102103, which addresses three of the policy forms addressed in this matter.

13. Settlement negotiations were conducted over the course of two days in Carmel, Indiana and included participation from the class representatives and all parties' actuaries. Kanner aff. ¶33.

14. The portion of the settlement releasing the defendants from liability, as modified by the parties in their letters of March 11, 2002 and March 22, 2002, is referred to as the "release."

• Class members with in-force or current policies could choose: (1) to receive a replacement policy at a five percent discount; (2) to exchange the policy for a refund of all premiums paid less claims paid; or (3) to keep the policy with the right to request a refund of all premiums paid less claims paid if premiums increase above a certain percentage. In addition to these options, class members with in-force policies are entitled to either a five percent match on initial premiums for a new Conseco annuity policy or a 50 percent match on first year premiums for a new Conseco life insurance policy.

• Class members whose policies lapsed due to premium increases could choose: (1) a refund of all premiums paid less claims paid; and either (2) a five percent match on initial premiums for a new Conseco annuity policy; or (3) a 50 percent match on first year premiums for a new Conseco life insurance policy.

• Class members whose policies lapsed due to any other reason or who are currently receiving benefits could choose: (1) a five percent match on initial premiums for a new Conseco annuity policy; or (2) a 50 percent match on first year premiums for a new Conseco life insurance policy.

• All policyholders who wished to claim any portion of the recovery provided for under the settlement would be required to elect their desired remedy and to mail a prepared election form no later than 10 days before a final approval hearing. Those policyholders who failed to respond would be limited to keeping the policy with the right to request a refund of all premiums paid less claims paid if premiums increase above a certain amount.

• Class members wishing to be excluded from the settlement must send a written request for exclusion no later than 25 days before the final hearing.

• Each of the class representatives would receive incentive compensation of up to $10,000.

• Plaintiff's counsel could apply for attorneys' fees of up to $4.5 million.

• The parties would take steps to stay the *Blau, Lane* and *Weaver* actions, and, once the settlement is approved by the court, the parties would move for the dismissal of *Blau* and *Lane.*

In response to the motion, the office of the attorney general of the State of Texas requested permission to and subsequently was permitted to file an amicus curiae brief in this action opposing the motion.

After a preliminary hearing on the settlement, the court issued an order and opinion dated November 24, 2001,[15] in which it approved certification of the class sought by the plaintiff[16] and directed that the proposed notice of

15. *Milkman v. American Travellers Life Insurance Co.,* February term, 2000, no. 3775 (Nov. 26, 2001) (Herron, J.) (available at http://courts.phila.gov/cptcvcomp.htm). The November 24, 2001 opinion is referred to as the "November opinion," and the November 24, 2001 order is referred to as the "November order."

16. In the November opinion, the court certified the following "class":

"All persons who purchased home health care (HHC), nursing home or long-term care (LTC) policies from 1975 to present from the following companies: Conseco Senior Health Insurance Company (except for Preference and FQ series), Conseco Health Insurance Company (except for Solution series), American Travellers Life Insurance Company, ATL Life Insurance Company, Great Republic Life Insurance Company, Transport Life Insurance Company, Universal Fidelity Life Insurance Company, Pioneer Life Insurance Company, Conseco

the settlement to be sent to the class. The November order also mandated the establishment of a toll-free hotline[17] and a website[18] through which class members could request or view additional information to help them in their decision-making process. The court scheduled a final hearing date of February 13, 2002, which set February 4, 2002 as the date by which forms were due and January 22, 2002 as the date by which objections to or requests for exclusion from the settlement were to be postmarked.

The notice was subsequently sent to all 751,374 identifiable class members via first class mail on December 27 and 29, 2001,[19] and was published in *USA Today* on December 28, 2001.[20] The result was impressive: over 22,000 class members made use of the hotline or contacted class counsel directly,[21] and the website received

Life Insurance Company of New York (except for Preference, FQ, and Solutions series), J.C. Penney Life Insurance Company, Continental Life Insurance Company, National Group Life Insurance Company and Health and Life Insurance Company of America. . . . Excluded from the class are the defendants, their affiliates, subsidiaries, and any judicial officer presiding over the settlement." Slip op. at 4.

17. The hotline telephone number is 1-877-229-3830. A second telephone number for rate information was established at 1-877-902-5792.

18. The website is located at http://www.ltchhcsettlement-agreement.com.

19. Approximately 4,200 class members were inadvertently omitted from the notice mailing list. These omitted class members will be addressed separately and are not governed by the decisions reached in this opinion and the accompanying order.

20. A verification of publication has been submitted to the court.

21. The parties contend that 79,268 calls were placed to the hotline as of January 31, 2002. Affidavit of Richard W. Simmons ¶11. In addition, approximately 650 class members contacted class counsel di-

over 237,000 hits. Fewer than 200 objections to the settlement were received,[22] and fewer than 5,000 class members opted out of participating in the settlement.

## DISCUSSION

The court understands and empathizes with the concerns expressed by the handful of class members who have questioned the settlement's adequacy. There is no question that the settlement does not award all that the complaint seeks or all that class members would, no doubt, hope for from this suit. Indeed, when compared with the pleadings submitted by the plaintiff, the settlement appears insufficient to address the harm inflicted and overly accommodating to the defendants' interests. However, it is important that the settlement and the class's expectations be viewed not in a vacuum where each of the complaint's allegations are treated as fact, but rather in the context of the risks of continuing the litigation, the likelihood of a successful prosecution of the class's claims and the length and complexity of further litigation. When the settlement is examined in this setting, it is far more attractive than it may appear at first glance. For these reasons, the court has approved the settlement

---

rectly. Pl. mem. in support of mot. for final app. of class settlement and class cert. 16.

22. The parties contend that only 87 objections were filed in accordance with the instructions set forth in the notice. When one considers objections that were received after the February 4, 2002 deadline, however, the number is approximately twice that. Because the late objections are cumulative in terms of the concerns they raise, whether they are considered is immaterial to the court's decision. Those class members filing objections are referred to as "objectors."

and ordered the payment of the attorneys' fees and class representative incentive awards as requested.

## I. *The Court Has Approved the Settlement*

Under Pennsylvania law, a class action may not be settled without a hearing and court approval. Pa.R.C.P. 1714(a). After reviewing the documents and conducting a hearing, the court believes that the parties are entitled to a presumption that the settlement is fair to the class. Moreover, an analysis of the settlement in accordance with the criteria established by the Pennsylvania Supreme Court reveals that while the settlement may not be ideal, it falls within the range of reasonableness required for court approval.

### A. The Parties Are Entitled to a Presumption That the Settlement Is Fair

In *Dauphin Deposit Bank and Trust Co. v. Hess,* 556 Pa. 190, 727 A.2d 1076 (1999) *(Dauphin II),* the Pennsylvania Supreme Court noted with approval the principle that "settlements are favored in class action lawsuits." 556 Pa. at 194, 727 A.2d at 1078. See also, *Doe v. Delie,* 257 F.3d 309, 322 (3d Cir. 2001) ("The law favors settlement, particularly in class actions and other complex cases, to conserve judicial resources and reduce parties' costs.");[23] *Krangel v. Golden Rule Resources Ltd.,*

23. While not binding, federal cases interpreting the federal class action rules, as well as the federal rules themselves, can have persuasive value in Pennsylvania courts. *McMonagle v. Allstate Insurance Co.,* 460 Pa. 159, 167, 331 A.2d 467, 471-72 (1975). Looking to Rule 23 is especially justified here, as Rule 1714 "incorporates the provisions of present federal Rule 23(e)," which governs the dismissal of federal class actions. Rule 1714–Explanatory note–1977.

514

194 F.R.D. 501, 504 (E.D. Pa. 2000) ("The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation."); Herbert B. Newberg and Alba Conte, Newberg on Class Actions §11.41 (3d ed. 1992) ("The compromise of complex litigation is encouraged by the courts and favored by public policy. By their very nature, because of the uncertainties of outcome, difficulties of proof, and length of litigation, class action suits lend themselves readily to compromise."). Under certain conditions, the settling parties are entitled to a presumption of fairness:

"The initial presumption of fairness of a class settlement may be established by showing:

"(1) That the settlement has been arrived at by arm's-length bargaining;

"(2) That sufficient discovery has been taken or investigation completed to enable counsel and the court to act intelligently;

"(3) That the proponents of the settlement are counsel experienced in similar litigation; and

"(4) That the number of objectors or interests they represent is not large when compared to the class as a whole.

"This initial presumption must then withstand the test of the plaintiffs' likelihood of success." Newberg §11.41. See also, *In re Inter-Op Hip Prosthesis Liability Litigation,* 204 F.R.D. 359, 380 (N.D. Ohio 2001) ("[W]hen a settlement is the result of extensive negotiations by experienced counsel, the court should presume it is fair."); *Grove v. Principal Mutual Life Insurance Co.,* 200 F.R.D. 434, 445 (S.D. Iowa 2001) ("[A] settlement that is the

product of arm's-length negotiations conducted by experienced counsel is presumed to be fair and reasonable."); *Lazy Oil Co. v. Watco Corp.,* 95 F. Supp.2d 290, 336 (W.D. Pa. 1997) (quoting Manual for Complex Litigation §30.42 (3d ed. 1995) to state that "a presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.").

In this instance, the parties have presented evidence that each of these four conditions is satisfied. Lead attorney for the class, Allan Kanner, has submitted an affidavit attesting to the arm's-length nature of negotiations between class and defendants' counsel and the extensive nature of the discovery undertaken in this matter. Aff. of Allan Kanner in support of pl. mot. for award of att'y fees and costs ¶¶17-24, 31-33. The impressive credentials and experience of class counsel were referenced with approval in the November opinion. Slip op. at 11. Moreover, there have been, at most, 200 objections filed, and fewer than 5,000 class members chose to opt out of the settlement. This reflects less than 0.7 percent of the class members to whom notice was sent and stands in stark contrast to the 85,000 forms that were returned by class members. Tr. of final hr'g, February 13, 2002, at 9. Accordingly, the settlement is entitled to an initial presumption of fairness.

### B. The Settlement Awards the Class a Moderate, If Not Overwhelming, Benefit

Essentially, there are four types of benefits generally available to class members:

• The "replacement benefit" allows a class member to replace his or her policy with a new Conseco HHC/LTC 5000 series policy. The class member will be issued the new policy at the rate charged for the class member's current age less a five percent discount and subject to standard underwriting.

• The "exchange benefit" allows a class member to exchange his or her policy for a sum equal to all premiums paid less all claims paid by the defendants. This sum, designated a "non-forfeiture benefit," will be kept by the appropriate defendant and can be used to pay for home health care or nursing home needs.

• The "retention benefit" permits a class member to retain his or her policy. If future premium increases accumulate to a certain percentage, as set forth in a sliding scale chart based on the class member's current age, the class member will receive notice of his or her right to receive a "contingent non-forfeiture benefit," which is based on the same principle as the non-forfeiture benefit. Class members who choose the retention benefit acknowledge the defendants' right to file for and to implement future premium increases as necessary.

• Under the "additional product benefit," a class member may choose between (a) a company match of five percent on the initial premium for a Conseco Hall Mark Marquee annuity policy or (b) a company match of 50 percent on the first year's premium on a Conseco life insurance policy, to a maximum of $500. The additional product benefit is transferable to a class member's family member.[24]

---

24. The replacement benefit, the exchange benefit, the retention benefit, the contingent non-forfeiture benefit and the additional product benefit are referred to collectively as the "benefits."

Class members with in-force or current policies may choose one of the replacement benefit, the exchange benefit or the retention benefit, and may also make use of the additional product benefit. Class members whose policies have lapsed because of premium increases[25] are eligible for both the exchange benefit and the additional product benefit, while class members who are still receiving benefits or whose policies have lapsed for any other reason are eligible for the additional product benefit. Those class members with in-force policies who do not respond by choosing from the options available to them are defaulted into the retention benefit, while those in other categories who do not respond will not receive any of the enumerated benefits.

The parties have valued the settlement at approximately $34.7 million. February 14, 2002 aff. of Mark Browne ¶9.[26] The exchange benefit has been calculated by adjusting the amount of the total premiums paid less claims paid and has an estimated value of $15.7 million based on the predicted portion of the class choosing this benefit. *Id.* ¶¶2, 6. The retention benefit has a total value of $6.7 million and has been calculated by estimating the number of class members who would exercise their

---

25. A class members' policy is deemed to have lapsed because of a premium increase if it lapsed or was cancelled within 60 days of a premium increase.

26. The court has received two affidavits from the parties' experts valuing the settlement. The first, dated February 5, 2002, is from Mark Browne, a professor of insurance and risk management at the University of Wisconsin-Madison, and values the settlement at $31.3 million. The second affidavit, dated February 14, 2002, is also from Professor Browne and provides updated information to support a settlement valuation of $34.7 million.

right to the contingent non-forfeiture benefit if their premiums increased by the appropriate amount. *Id.* ¶3. The replacement benefit is estimated at $3.1 million based on the $600 value of the five percent discount and the portion of the class expected to exercise this option. *Id.* ¶4. Finally, the parties estimate the additional product benefit to be worth $3.6 million. *Id.* ¶7. On top of this, the defendants have paid or will pay over $1 million in administrative and class notification costs and have agreed to pay class counsel fees of up to $4.5 million and class representative incentive awards of up to $40,000.

In its initial review of the settlement, the court made the following observations:

"The court admits to having concerns about the settlement. Effectively, the settlement does little more than allow class members to purchase more insurance from the defendant, albeit at a reduced and discounted rate. Those class members who choose not to purchase additional insurance may be reimbursed for premiums paid but remain, from what the complaint alleges, uninsured and uninsurable. The plaintiff is excepted from these limits on compensation, as she is entitled to up to $10,000 as an 'incentive award.' Meanwhile, the plaintiff's attorneys will receive up to $4.5 million.

"Nevertheless, the settlement does offer some obvious benefits to the members of the class. Many of the class members are advanced in age and have an interest in seeing this matter resolved as promptly as possible. In addition, the settlement allows class members a range of options and may allow certain members of the class access to insurance benefits that would otherwise be un-

available. It is also significant that the settlement appears to be the result of arm's-length negotiations among the parties after extensive discovery." Slip op. at 21. (footnote omitted)[27]

The court continues to harbor reservations about the settlement. None of the valuations reflect the benefits or profits the defendants will reap from providing additional insurance to the class members, and according to the parties' own estimates, the vast majority of class members will not benefit from the settlement in any way.[28]

---

27. The court also noted the comparative value of the settlement:

"It is asserted that this value represents approximately 15 to 18 percent of the settlement's value. This approximation, however, appears to assume that each class member will take full advantage of the offers made in conjunction with the settlement and may be significantly higher if all class members do not purchase additional insurance or receive other compensation from the defendants." Slip op. at 21 n.11.

28. Looking at the specific figures provided in Professor Browne's original affidavit, those class members with lapsed policies will not be defaulted into any category, so those who do not respond will not receive any benefit. Accordingly, it is estimated that of the 483,472 members whose policies lapsed for reasons other than rate increases, approximately 481,103 will not benefit from the settlement. Similarly, of the 24,855 members whose policies lapsed due to rate increases, at least 24,084 will receive no benefit whatsoever, while 7,096 out of the 7,323 holders of policies currently being paid will receive no benefit. In addition, 95 percent of the in-force policyholders have elected or been defaulted into the retention benefit option. Of these, it is estimated that only 1.2 percent will elect to receive the contingent nonforfeiture benefit, meaning that 232,176 in-force policyholders will ultimately receive no benefit from the settlement. An additional 666 members with in-force policies will elect the replacement benefit, but will be declined coverage in the underwriting process. As a result, it is predicted that at least 745,125 class members out of a class of 762,235 (97.8 percent) will not actively participate in the settlement and thus will not benefit from the settlement in any way.

However, the value of a class action settlement is not to be determined from the cost or benefit to the defendant, but rather the benefit obtained by the class. See *In re The Prudential Insurance Co. of American Sales Practices Litigation,* 962 F. Supp. 450, 557 (D.N.J. 1997), *aff'd,* 148 F.3d 283 (3d Cir. 1998) *(Prudential I)* ("The cost of the relief to Prudential is not the measure of class member benefit. The value of the relief to the class, which may be substantial, is what matters."). The court also recognizes that the option of participating in the settlement by choosing a suitable benefit is available to all class members and that any low level of participation is attributable to an individual class member's choice not to participate.

Moreover, the settlement comports with the generally accepted requirements for scrip or coupon settlements. Courts have often found non-pecuniary settlements to merit final approval. See *e.g., In re Domestic Air Transportation Antitrust Litigation,* 148 F.R.D. 297 (N.D. Ga. 1993) (approving class action settlement awarding cash and discount travel certificates); *In re Mid-Atl. Toyota Antitrust Litigation,* 564 F. Supp. 1379 (D. Md. 1983) (approving class action settlement awarding up to $135 in cash or up to $250 in retail value goods, services or trade-in allowance); *In re Cuisinart Food Processor Antitrust Litigation,* no. MDL 447, 1983 WL 153 (D. Conn. Oct. 24, 1983) (approving class action settlement in which each class member received a coupon entitling the user to up to $100 in product discounts); *Ohio Public Interest Campaign v. Fisher Foods Inc.,* 546 F. Supp. 1 (N.D. Ohio 1982) (approving class action settlement awarding injunctive relief and food purchase certificates).

However, a number of criticisms have been leveled against class action settlements that require class members to make additional purchases from a defendant to take advantage of the settlement. See *e.g., Jonathan Sheldon & Carolyn Carter, Consumer class actions: A Practical Litigation Guide* §11.6.1 (4th ed 1997) (discussing the disadvantages of non-cash settlements); *Severin Borenstein, Settling for Coupons: Discount Contracts as Compensation and Punishment in Antitrust Lawsuits, 39 J.L. & Econ. 379* (1996). In response, the National Association of Consumer Advocates has proposed the following guidelines when addressing certificate settlements:

"Certificate settlements have many disadvantages and should be proposed by class counsel only in the rare case. For example, if (1) the primary goal of the litigation is injunctive and the defendant agrees to an injunction, or the certificates are good for the purchase of small ticket consumable items which class members are likely to purchase, or the certificates represent true discounts that would not otherwise be available, (2) the certificates are freely transferable, and (3) there is a market-maker to insure a secondary transfer market, a certificate settlement might be appropriate. A few basic positions are clear:

• Certificate-based settlements should never require identifiable class members to purchase major, large ticket items from the defendant as the sole significant relief to the class.

• Certificates should have some form of guaranteed cash value. For example, the certificates could have a lesser cash redemption value (either upon issuance or

within a reasonable period of time) that still gives the class members a benefit that is significant in relation to the actual damages which would be provable at trial. As a less-preferable approach, the defendant could contract with a market-maker that would promise to purchase all available certificates for a set price that is significant in relation to the likely recovery at trial.

• Certificate settlements should never be proposed to the court unless it is apparent that the defendant is providing greater true value (*i.e.,* not just the face value of the certificates or their potential value) to class members than would be available from an all-cash settlement. There may be legitimate tax or financial-accounting reasons why a greater recovery for class members can be had from a non-cash settlement. However, class counsel should inquire about the defendant's reasons for preferring a non-cash settlement. The beginning assumption should always be that the defendant prefers a non-cash to a cash settlement because it believes the true value to be less. Since the defendant will usually be in a superior position to predict the ultimate redemption rate and benefit to the class, its preference for a non-cash settlement should be viewed with skepticism.

• A settlement involving certificates should require a minimum level of redemption by the class members within a reasonable period of time. In the event actual redemption does not meet this minimum level, the defendant should provide alternative relief in the form of a common fund. This requirement protects against the use of a meaningless certificate settlement that has little or no impact on a defendant, and little or no compensatory value to the plaintiff class.

• Class counsel and defendants should submit to the court and all counsel of record detailed information about redemption rates and coupon transfers during the entire life of the coupon. By doing so, a public record will be made of what works and what does not work in non-cash settlement cases." National Association of Consumer Advocates, *Standards and Guidelines for Litigating and Settling Consumer Class Actions,* 176 F.R.D. 375, 383-84 (1997).

The settlement meets each of these requirements. Although the settlement allows class members to purchase additional insurance, neither the exchange benefit nor the retention benefit requires any additional purchase, and both effectively provide a guaranteed cash value. It appears to the court that the defendants are willing to surrender more in the settlement than they would for a cash settlement. See Kanner aff. ¶34 ("The key to settlement was finding a solution . . . mindful of Conseco's need to manage the current policies in an actuarially sound manner in the future and maintain solvency."). In addition, over 85,000 class members accounting for more than 10 percent of the class have already responded to and taken advantage of the settlement. Tr. 9. Moreover, in the court's mind, it is not insignificant that the settlement offers class members a wide range of options to choose among and does not lock them into a specific benefit that may be inappropriate for any one class member's circumstances.

It has been argued that *In re General Motors Corp. Pickup Truck Fuel Tank Products Liability Litigation,* 55 F.3d 768 (3d Cir. 1995), requires that the court reject the settlement because of the holding that non-cash and coupon settlements are inappropriate. This is a misread-

ing of *General Motors Corp.* Rather, the Third Circuit held that the manner in which the trial court conducted its examination of coupons' value and the conditions under which the class members could redeem their coupons in the context of that case was improper. 55 F.3d at 806-19. Any blanket attempt to apply *General Motors Corp.* to all non-cash settlements would therefore be in error, and the fact that the settlement does not put cash directly in class members' pockets is irrelevant.

The Texas attorney general has raised the prospect that the additional product benefit may violate Texas law because it provides for a rebate on insurance.[29] Statutes

---

29. Texas Insurance Code article 21.21, section 4(8) defines the following as an unfair method of competition or an unfair and deceptive act or practice:

"(8) Rebates. (a) Except as otherwise expressly provided by law, knowingly permitting or offering to make or making any contract of life insurance, life annuity or accident and health insurance, or agreement as to such contract other than as plainly expressed in the contract issued thereon, or paying or allowing, or giving or offering to pay, allow, or give, directly or indirectly, as inducement to such insurance, or annuity, any rebate of premiums payable on the contract, or any special favor or advantage in the dividends or other benefits thereon, or any valuable consideration or inducement whatever not specified in the contract; or giving, or selling, or purchasing or offering to give, sell, or purchase as inducement to such insurance or annuity or in connection therewith, any stocks, bonds, or other securities of any insurance company or other corporation, association, or partnership, or any dividends or profits accrued thereon, or anything of value whatsoever not specified in the contract[.]" Tex. Ins. Code 21.21 §4(8). Other states including Pennsylvania have similar prohibitions. See *e.g.*, Ariz. Rev. Stat. §§20-449, 20-451; Fla. Stat. §626.9541(1)(h)(1)(b); Ga. Code §33-6-4(b)(8)(a); 215 Ill. Comp. Stat. 5/151; Mass. Gen. Laws ch. 175 §183, ch. 176D §3; Mich. Comp. Laws 500.2070; N.J. Stat. 17:46B-35; N.Y. Ins. Law §§2324, 4224; N.C. Gen. Stat. §58-63-15; Ohio Rev. Code §3901.21; 40 Pa.C.S. §1171.5; Va. Code §38.2-509.

such as these, which often date from the 1800s, are relatively common and typically bar attempts to induce the purchase of additional insurance:

"Most states . . . have laws that prohibit insurance companies, agents, brokers, and others from giving rebates as an inducement to insurance. They *generally prohibit only rebates made as an inducement to insurance* and that are not set forth in the policy. . . . The purposes of the statutes were to protect the solvency of the insurance companies, prevent unfair discrimination among insureds of the same class, avoid concentration of the market in a few insurance companies, and avoid unethical sales practices." Tracy J. Bateman, Annotation, *Insurance Anti-Rebate Statutes: Validity and Construction,* 90 A.L.R.3th 213, 220 (1991). See also, Couch on Insurance §69:38 (3d ed. 1996) ("[T]ransactions which otherwise might appear to be rebates will not be so regarded under the statute if not done as an inducement to insurance."). Courts have consistently held that anti-rebate statutes are not violated where an insured gives consideration for the rebate. See *e.g., Julian v. Guarantee Life Insurance Co.,* 49 So. 234, 236 (Ala. 1909) (holding that premium reduction was legal where the insured had given consideration for reduction); *Associated Cal. Loggers Inc. v. Kinder,* 168 Cal. Rptr. 67 (Cal. Ct. App. 1980) (holding that an agreement between insurer and insureds whereby insurer reimbursed insureds for costs of providing insurer's administrative services did not violate anti-rebate statutes where agreements were not offered as an inducement to purchase insurance and reimbursements were reasonable in comparison to services rendered); *Northern Assurance Co. v. Meyer,* 160 N.W. 617 (Mich.

1916) (holding that insurance agent's purchase of drinks for prospective insureds did not violate anti-rebate statute); Couch §2.32 (citing *Julian* to state that "[a]n agreement whereby an insured was to receive payment from the insurance company or have premiums reduced in consideration for services provided, or to be provided to the insurance company, did not constitute a rebate if there was a legitimate obligation to perform services of value to the company. . . ."). More specifically, insurance premium discounts given in the context of a lawsuit settlement have been treated as legal and proper under such statutes. See *e.g., Fidelity & Cas. Co. of New York v. Nello L. Teer Co.,* 179 F. Supp. 538 (M.D.N.C. 1960) (holding that payment under settlement agreement between insurer and insureds concerning disputed premium claims was a compromise that did not violate anti-rebate statute); *Cox v. Department of Insurance,* 823 P.2d 177, 181 (Idaho Ct. App. 1991) (refusing to apply anti-rebate statute where payment was not an inducement to buy insurance but rather "was made in an effort to settle a disputed claim with the [insureds] and to avoid personal liability"). In this case, a determination in favor of legality is further advanced by the fact that there is no evidence whatsoever that the settlement is a ruse to sell additional insurance and to evade anti-rebate statutes. Rather, it is clear that the discounts provided under the additional product benefit are an integral part of the defendants' offer to dispose of this matter. Thus, the portion of the settlement offering a reduction in premiums does not violate anti-rebate statutes.

Likewise, the release, in its revised form, is not exceptional or overly broad. A release given in conjunc-

tion with the settlement of a class action may release "not only those claims alleged in the complaint, but also a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action." *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1287 (9th Cir. 1992). (citation, quotation marks and emphasis omitted) See also, *In re Grimes v. Vitalink Communications Corp.*, 17 F.3d 1553, 1563 (3d Cir. 1994) ("[I]t is widely recognized that courts without jurisdiction to hear certain claims have the power to release those claims as part of a judgment" to "serve[] the important policy interest of judicial economy by permitting parties to enter into comprehensive settlements that prevent relitigation of settled questions at the core of a class action."). Cf. *Schwartz v. Dallas Cowboys Football Club Ltd.*, 157 F. Supp.2d 561 (E.D. Pa. 2001) (rejecting class action release that covered future activities and events not part of litigation and whose broad scope was not supported by settlement consideration). Such a global release of "all claims arising out of a transaction which formed the basis for a class action is an accepted feature of a class action settlement." *Aide v. Chrysler Fin. Corp.*, 699 N.E.2d 1177, 1180 (Ind. Ct. App. 1998) (citing *Matsushita Elec. Indus. Co. Ltd. v. Epstein*, 516 U.S. 367 (1996)).

In its entirety, the release reads as follows:

"Plaintiffs and the settlement class, for themselves and for all of their respective heirs, executors and administrators, and for their respective representatives, predecessors, successors and assigns, shall release and forever discharge defendants and their past, present, and future

officers, directors, agents, employees, attorneys, advisors, representatives, predecessors and successors, corporate parent companies and subsidiaries, divisions, affiliates, shareholders, and the heirs executors, administrators, successors, attorneys and assigns of any of the foregoing (collectively 'defendants') from any and all claims, actions, suits, obligations, demands, promises, liabilities, costs, expenses, and attorneys' fees whatsoever (whether class or individual in nature), whether based on any federal or state law or a right of action, in law or in equity or otherwise, which the plaintiffs and the class members or any of them ever had, now have, or can have, or shall or may hereafter have regarding the policies set forth in the definition of the settlement class (the 'policies') (collectively, the 'released transactions'), as follows:

"(A) any claims rising out of any acts, failures to act, omissions, oral or written representations, facts, events, transactions or occurrences set forth or alleged in the actions or in any way related directly or indirectly to the subject matter of the actions;

"(B) any claims for fraud, non-disclosure, deceptive trade practices, or other claims related to premium increases, marketing, solicitation, application, underwriting, acceptance, sale, purchase, operation, retention, improper payment of premium administration, replacement, or suitability of any policies issued by any of the defendants during the class period, except for claims related to bad faith denial of claims;

"(C) any and all acts, omissions, facts, matters, transactions, occurrences or oral or written statements or representations made or allegedly made in connection with

or directly or indirectly relating to the settlement agreement or the settlement of the actions, except nothing in this release shall preclude any action to enforce the terms of the settlement; and

"(D) any and all claims for attorneys' fees, costs or disbursements incurred by plaintiffs' counsel or by plaintiffs or the class members, or any of them, in connection with or related in any manner to the actions, the settlement of the actions, or the administration of such settlement, except to the extent otherwise specified in this settlement agreement.

"Plaintiffs and the class members expressly understand that section 1542 of the California Civil Code provides that:

"'A general release does not extend to claims which a creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.'

"Plaintiffs and the class members hereby agree (i) that the provisions of section 1542 are hereby knowingly and voluntarily waived and relinquished, and (ii) that the provisions of all similar federal or state laws, rights, rules, or legal principles of any other jurisdiction, to the extent that they are found to be applicable herein, are also hereby knowingly and voluntarily waived and relinquished; and

"In connection with this release, plaintiffs and the class members acknowledge that they are aware that they may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which they now know or believe to be true with respect

to the matters released herein. Nevertheless, it is the intention of plaintiffs and the class members in executing this release to fully, finally and forever settle and release all such matters, and all claims relating thereto, which exist, hereafter may exist, or might have existed (whether or not previously or currently asserted in any action)."

The court found the initial draft of the release overly broad, as the words immediately preceding subparagraph (A) were "including, but not limited to" in place of "as follows." This would have made the claims described in subparagraphs (A) through (D), which are essentially the claims presented in this action, nothing more than illustrations and would have rendered the release applicable to all of the class members' past, present and future claims regarding any aspect of the policies. In this form, the release was overly broad, as it would have implicated and nullified a wide range of claims related to the policies that were not addressed here.

As revised, the release is appropriate in scope. The release's language is limited to actions related to the policies and covers only those claims that arise from the factual scenario presented in the complaint. Moreover, the release exempts "claims related to bad faith denial of claims" and not merely bad faith actions alone.[30] Thus, the release, as revised, is appropriate and suited to the resolution of this action.

The miscellaneous challenges to the financial and other worth of the settlement must also be dismissed. The fact

---

30. This change was made by the parties in response to criticism leveled by the Texas attorney general.

that the issuance of any additional insurance policies is subject to underwriting does not render the accompanying benefits illusory, and the estates of deceased class members can pass on the additional product benefit to surviving family members. Additionally, the fact that other benefits, such as interest on amounts previously paid and coverage of assisted living costs, could have been provided in the settlement does not negate the benefits that the settlement *does* provide.

In short, the settlement provides a number of benefits to the class, and the benefits portion of the settlement is worth no less than $34.7 million. In addition to the specific benefits provided, the settlement is extremely flexible and gives class members the advantage of choosing the particular benefit best suited to their situation.

### C. The Settlement Satisfies the Seven Factors That Pennsylvania Courts Must Consider When Evaluating Proposed Class Action Settlements

In *Dauphin II*, the Pennsylvania Supreme Court held that the following seven factors should be considered when evaluating the propriety of a proposed class action settlement:

"(1) the risks of establishing liability and damages;

"(2) the range of reasonableness of the settlement in light of the best possible recovery;

"(3) the range of reasonableness of the settlement in light of all the attendant risks of litigation;

"(4) the complexity, expense and likely duration of the litigation;

"(5) the state of the proceedings and the amount of discovery completed;

"(6) the recommendations of competent counsel, and;

"(7) the reaction of the class to the settlement." 556 Pa. at 197, 727 A.2d at 1079-80 (citing *Buchanan v. Century Federal Savings & Loan Association,* 259 Pa. Super. 37, 393 A.2d 704 (1978)). In considering these factors, there is no exact calculus or formula for the court to use:

"In effect the court should conclude that the settlement secures an adequate advantage for the class in return for the surrender of litigation rights. As with valuation problems in general, there will usually be a difference of opinion as to the appropriate value of a settlement. For this reason, judges should analyze a settlement in terms of a 'range of reasonableness' and should generally refuse to substitute their business judgment for that of the proponents." *Buchanan,* 259 Pa. Super. at 46-47, 393 A.2d at 709. (citations and footnotes omitted)

Given the nature of the factors set forth *supra,* it is clear that a Pennsylvania court may not make a final determination as to the propriety of any settlement plan without waiting to hear and weighing the class members' positions. See *Dauphin Deposit Bank & Trust Co. v. Hess,* 698 A.2d 1305, 1308 (Pa. Super. 1997), *aff'd,* 556 Pa. 190, 727 A.2d 1076 (1999) *(Dauphin I)* ("*Buchanan* requires that a court know the class members' reaction to the proposed settlement in advance of making a determination as to the 'reasonableness' of the plan"). With this in mind, the court will consider each of the seven factors seriatim.

## 1. *Risks of establishing liability and damages*

It goes without saying that "the risks surrounding a trial on the merits are always considerable." *In re Diet Drugs,* nos. 1203, 99-20593, 2000 WL 1222042, at *61 (E.D. Pa. Aug. 28, 2000) (quoting *Weiss v. Mercedes-Benz of N. Am. Inc.,* 899 F. Supp. 1297, 1301 (D.N.J. 1995), *aff'd,* 66 F.3d 314 (3d Cir. 1995)). See also, *Newman v. Stein,* 464 F.2d 689, 693 (2d Cir. 1972) (stating that a reviewing court must recognize "the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion"). In examining the risks of litigation, a court must "examine what the potential rewards (or downsides) of litigation might have been had class counsel decided to litigate the claims rather than settle them" and balance "the likelihood of success if the case were taken to trial against the benefits of immediate settlement." *In re Safety Components Inc. Secs. Litig.,* 166 F. Supp.2d 72, 89 (D.N.J. 2001). (citations and quotation marks omitted) Moreover, a reviewing trial court is not to conduct a trial on the merits of the claim:

"[T]he settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits. Neither the trial court nor this court is to reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements. The proposed settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators." *Officers for Justice v.*

*Civil Serv. Comm'n of City & County of San Fran.,* 688 F.2d 615, 625 (9th Cir. 1982). See also, *Trief v. Dun & Bradstreet Corp.,* 840 F. Supp. 277, 281 (S.D.N.Y. 1993) ("[D]istrict courts do not attempt to decide the merits of the case, and, absent evidence of fraud or overreaching, consistently have refused to act as Monday morning quarterbacks in evaluating the judgment of counsel."); *Dauphin I,* 698 A.2d at 1309 ("In evaluating the likelihood of success, a court should not attempt to resolve unsettled issues or legal principles but should attempt to estimate the reasonable probability of success.").

One of the most prominent admonitions in Pennsylvania appellate court opinions reviewing decisions on proposed class action settlements is the rebuke iterated by the Superior Court in *Buchanan:*

"[T]he parties are not involved in the negotiation of a loan; they are involved in very complex litigation where a myriad of factors has emerged. After determining that the plaintiffs' cause of action was potentially meritorious, the lower court never attempted to establish a range of reasonableness in light of the attendant risks of litigation. Actually, by reviewing the case in this manner, *the court acted as if it had granted summary judgment for the plaintiffs* on the liability issue. This was without question *an inappropriate standard of review.*" 259 Pa. Super. at 50, 393 A.2d at 711. (emphasis added and footnote omitted) With this reprimand in mind, the court must review the risks of the plaintiff's attempt to establish liability on the part of the defendants and damages to class members.

Here, the plaintiff has alleged claims for violations of the UTPCPL, negligent misrepresentation, intentional

misrepresentation and concealment, and constructive fraud. These claims are based on the plaintiff's assertion that the defendants purposely underpriced the policies to gain a greater market share and planned to raise rates after they issued the policies to class members to recoup their losses. In addition, the policy cover guarantees the renewability of the policy, and the plaintiff argues that the defendants' purposeful underpricing rendered this guarantee illusory and deceptive.

The class faced several ominous hurdles in obtaining recovery. First, the front page of the policy states that the defendants may change the renewal premium rate so long as it is changed for all similar policies issued in the policyholder's state of residence. This statement is even more damning as at least one plaintiff and one objector have admitted to being aware of its existence and the defendants' general right to increase policy premiums. Pl. mot. for final app. and cert. of class settlement exhibits 22-23.

Second, the plaintiff's claims may be subject to the filed rate doctrine. This doctrine originated in *Keogh v. Chicago and Northwest Railway Co.,* 260 U.S. 156 (1922), where the Supreme Court limited the plaintiff's ability to challenge railroad shipping rates that had been approved by the Interstate Commerce Commission as reasonable and non-discriminatory. The doctrine has since been extended to state public utilities and agencies[31] and now comes in many incarnations, but essen-

---

31. As noted by one federal court, "[t]he filed rate doctrine has been held to apply equally to rates filed with state agencies by every court to have considered the question." *Destec Energy Inc. v. South-*

tially bars recovery for injuries, including fraud-related injuries, arising from rates properly filed with the appropriate regulatory agency:

"The filed rate doctrine forbids a regulated entity from charging rates for its services other than those properly filed with the appropriate federal regulatory authority. The filed rate doctrine prohibits a party from recovering damages measured by comparing the filed rate and the rate that might have been approved absent the conduct in issue. The purpose of the filed rate doctrine is to: (1) preserve the regulating agency's authority to determine the reasonableness of rates; and (2) insure that the regulated entities charge only those rates that the agency has approved or been made aware of as the law may require." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 954 F.2d 485, 488 (8th Cir. 1992). (citations, brackets and quotation marks omitted) See also, *Amundson & Assocs. Art Studio Ltd. v. Nat'l Council on Compensation Ins.*, 988 P.2d 1208, 1213 (Kan. Ct. App. 1999) ("The filed rate doctrine stands for the proposition that because an administrative agency is vested with the authority to determine what rate is just and reasonable, courts should not adjudicate what a reasonable rate might be in a collateral lawsuit.").

Like many other states, Pennsylvania has established the post of insurance commissioner for the Commonwealth and has imposed strict statutory and regulatory restrictions on insurance companies, including compa-

---

*ern Cal. Gas Co.*, 5 F. Supp.2d 433, 458 (S.D. Texas 1997) (citing, inter alia, *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 20 (2d Cir. 1994), and *Taffet v. Southern Co.*, 967 F.2d 1483, 1494 (11th Cir. 1992)).

nies that issue LTC policies. See generally, Pa.C.S. title 40. See also, *e.g.,* 40 Pa.C.S. ch. 2, art. XI (establishing standards for long-term care insurance); 40 Pa.C.S. §1109 (requiring copies of policies to be filed with the insurance commissioner); 31 Pa. Code ch. 89, subch. M (regulating long-term care insurance). Accordingly, courts in Pennsylvania and other jurisdictions have applied the filed rate doctrine to insurance premiums and have used it to bar plaintiffs from contesting premium increases approved by state regulatory agencies. See *e.g., Stevens v. Union Planters Corp.,* no. civ. a. 00-CV-1695, 2000 WL 33128256, at *3 (E.D. Pa. Aug. 22, 2000) (holding that "under the filed rate doctrine, a question regarding reasonable rates should be addressed to the Department of Insurance" and that "the rate plaintiff was charged is conclusively presumed reasonable under the filed rate doctrine"); *Horwitz v. Bankers Life & Cas. Co.,* 745 N.E.2d 591, 605 (Ill. App. Ct. 2001) ("[T]he filed rate doctrine precludes a private right of action governing premium rate disputes. . . ."); *Amundson & Assocs.,* 988 P.2d at 1216 ("If proposed rates are filed with and approved by the insurance commissioner, the filed rate doctrine applies. . . . The insurance commissioner has the sole power of regulating the rates and that power includes examining any information deemed necessary to determine the excessiveness or adequacy of the rates."); *N.C. Steel Inc. v. National Council on Compensation Insurance,* 496 S.E.2d 369 (N.C. 1998) ("The General Assembly has given the insurance commissioner the duty of setting rates. . . . We do not believe that . . . the General Assembly intended that duly set rates be challenged in another forum. When the commissioner approved the

rates, they became the proper rates."). Cf. *Kentucky v. Anthem Insurance Cos. Inc.,* 8 S.W.3d 48 (Ky. Ct. App. 1999) (holding that the filed rate doctrine barred request for damages but did not preclude request for injunction and civil penalties). But see Allan Kanner, *The Filed Rate Doctrine and Insurance Fraud Litigation,* 76 N.D. L. Rev. 1 (2000) (arguing against the application of the filed rate doctrine to insurance fraud claims). Were the court to adopt and to apply the filed rate doctrine in this instance, it would amount to a severe blow to the plaintiff's challenge to the premium increases' propriety.

As a third obstacle, many class members may have faced a statute of limitations defense that would have barred their claims. According to the complaint, the policies were sold beginning in 1987. Compl. ¶32. Pennsylvania applies a six-year statute of limitations to UTPCPL claims, *Gabriel v. O'Hara,* 368 Pa. Super. 383, 534 A.2d 488 (1987), and a two-year statute of limitations to fraud and most other tort claims. 42 Pa.C.S. §5524. Depending on when the defendants' allegedly improper actions took place, it is conceivable that some class members' claims could be barred by the appropriate statute of limitations.

The court also notes that the plaintiff's claims had not been certified prior to the presentation of the settlement to the court. Addressing consumer claims such as this one as class actions secures a particular benefit for injured persons for a variety of reasons.[32] However, it is

---

32. This advantage has been noted by courts and commentators alike. See *e.g., Phillips Petroleum v. Shutts,* 472 U.S. 797, 809 (1985); *Lozada v. Dale Baker Oldsmobile Inc.,* 197 F.R.D. 321, 332 (W.D. Mich. 2000); *Lake v. First Nationwide Bank,* 156 F.R.D. 615, 626

far from certain that the plaintiff would have been able to establish those elements necessary for certification. Cf. *Weinberg v. Sun Co.,* 565 Pa. 612, 777 A.2d 442 (2001) (holding that private UTPCPL claim included individual questions of fact and could not be certified); *Klemow v. Time Inc.,* 466 Pa. 189, 197 n.17, 352 A.2d 12, 16 n.17 (1976) (Because a showing of reliance, as required for a fraud action, "would normally vary from person to person, this cause of action is not generally appropriate for resolution in a plaintiff-class action."). This adds an additional element of risk that would not be as significant in an action that had already been certified.

Finally, there was considerable risk in attempting to establish damages. The complaint contends that the policies were initially underpriced. Compl. ¶¶35, 48. When added to any benefits that class members received under the policies, this underpricing could negate some, if not all, damages incurred by the class. Additionally, if the rate increases were justified, the plaintiffs would find it even more difficult to prove their claim of damages. Given these facts, the court must conclude that the plaintiff's risk of establishing liability and damages is quite high.

---

(E.D. Pa. 1994); *Vasquez v. Superior Court,* 94 Cal. Rptr. 796, 800-801 (Cal. 1971); *Cope v. Metropolitan Life Ins. Co.,* 696 N.E.2d 1001, 1003-1004 (Ohio 1998); Samuel Issacharoff, *Group Litigation of Consumer Claims: Lessons from the U.S. Experience,* 34 Tex. Int'l L.J. 135, 137 (1999); *Standards & Guidelines,* 176 F.R.D. at 377; Sheldon & Carter §8.5.

## 2. *The range of reasonableness of the settlement in light of the best possible recovery*

In comparing a proposed settlement's value with the best possible recovery, "[t]he trial court should not make a proponent of a proposed settlement justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes." *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir. 1977). (citation and quotation marks omitted) Rather, a court should focus on "the economic valuation of the proposed settlement" and whether the "settlement represents a compromise in which the highest hopes for recovery are yielded in exchange for certainty and resolution and courts should guard against demanding too large a settlement based on the court's view of the merits of the litigation." *Safety Components Inc.,* 166 F. Supp.2d at 92 (quoting *In re Aetna Sec. Litig.,* no. MDL 1219, 2001 WL 20928, at *11 (E.D. Pa. Jan. 4, 2001)). (quotation marks and brackets omitted) When confronting a settlement involving an insurance company, a court should take into account the financial condition of the company and the company's ability to withstand a judgment. *In re Prudential Insurance Co. of America Sales Practice Litigation Agent Actions,* 148 F.3d 283, 321 (3d Cir. 1998) *(Prudential II).*

As discussed *supra,* the value of the settlement is at least $34.7 million. While the plaintiff has not provided a specific amount of best case scenario damages, it posits that any damages recovered and remedies awarded, including rescission, would have to be adjusted for ben-

efits received under the policies, the advantage of having continuing insurance coverage until trial and any number of offsets submitted and proven by the defendants. The court must also take into account the fact that no class had been certified prior to the settlement being proposed. See *General Motors Corp.*, 55 F.3d at 817 ("The value of a class action depends largely on the certification of the class. . . ."). In addition, the ability of the defendants to survive and to make payment on a significant judgment in this case has been called into question. Tr. 13-16.[33] Considering these factors, the value of the settlement falls within the range of reasonableness when compared with any possible recovery in this matter.

### 3. The range of reasonableness of the settlement in light of all the attendant risks of litigation

In *Dauphin II,* the Pennsylvania Supreme Court adopted the Superior Court's approach as to what a trial court should look at when comparing the reasonableness of a class action settlement with the risks of litigation:

"In deciding whether the settlement falls within a 'range of reasonableness,' we need to examine whether the proposed settlement secures an 'adequate' (and not necessarily the best possible) advantage for the class in

---

33. The settlement attempts to avoid the potential pitfall of Conseco's financial disruption by making Conseco Senior, a separate entity, responsible for the exchange and contingent exchange benefits. See aff. of Allan Kanner, Feb. 28, 2002 (discussing settlement discussion's goal of ensuring that defendants would be able to provide the benefits promised under the settlement). See also, aff. of William R. Legier, CPA, CFE (attesting to the fact that the settlement's structure allows Conseco Senior to meet its obligations thereunder).

exchange for the surrender of the members' litigation rights. . . .

"In this light, a court need not inquire into whether the 'best possible' recovery has been achieved. Rather, in view of the stage of the proceedings, complexity, expense and likely duration of further litigation, as well as the risks of litigation, the court is to decide whether the settlement is reasonable. . . .

"In the best of all possible worlds, the ideal result would be as the objectors perceive it to be. . . . However, the element of uncertainty inherent in any compromise exists when a judicial outcome is foregone for the certainty of settlement." 556 Pa. at 196, 727 A.2d at 1079.

The court has already reviewed the high risks of litigating this matter. When scrutinized in light of these risks, the settlement appears to be reasonable, satisfying the third prong of the *Dauphin II* test.

### 4. *The complexity, expense and likely duration of the litigation*

The complexity, expense and duration factor "captures the probable costs, in both time and money, of continued litigation." *In re Cedant Corp. Litigation,* 264 F.3d 201, 233 (3d Cir. 2001) (quoting *General Motors Corp.,* 55 F.3d at 812). (quotation marks omitted) The importance of this factor should not be underestimated:

"This . . . factor 'weighs heavily' in the court's analysis of the fairness of the settlement. See *e.g., Klein v. PDG Remediation Inc.,* no. 95 Civ. 4954, 1999 WL 38179, at *2 (S.D.N.Y. Jan. 28, 1999). Most class actions are inherently complex and settlement avoids the

costs, delays and multitude of other problems associated with them. See *In re NASDAQ Market-Makers Antitrust Litigation,* 187 F.R.D. 465, 477 (S.D.N.Y. 1998) ('[C]lass actions have a well deserved reputation as being most complex.'). Settlements of such complex matters are favored by courts. See *e.g., In re Medical X-Ray,* no. 93 Civ. 5904, 1998 WL 661515, at *3 (E.D.N.Y. Aug. 7, 1998)." *In re Austrian and German Bank Holocaust Litigation,* 80 F. Supp.2d 164, 174 (S.D.N.Y. 2000).

There is little doubt that the litigation of this case was likely to be quite complex. The class, as proposed by the plaintiff and certified by the court, consisted of over 750,000 members. Cases similar to the instant matter were proceeding in California and other jurisdictions, although the plaintiff alleges that the defendants' maneuvering ensured that ongoing discovery would not be completely coordinated. This would have added the complications of having parallel actions without any of the benefits. In addition, the underlying claims presented in the complaint required a detailed understanding of the nuances and intricacies of long-term care and home health care insurance and the applicable law, as well as the defendants' specific approaches and operations.

The expense and duration of litigating is similarly daunting. In initiating this action, counsel for the class traveled to or obtained documents from 31 state departments of insurance. To date, class counsel has incurred $150,000 in out-of-pocket expenses and logged approximately $1.5 million in attorney hours. These numbers would certainly climb, as class counsel faced a formidable defense team of the defendants' in-house counsel and top-notch attorneys from California, New York and

Pennsylvania. Moreover, prior to the settlement being presented, the court had not addressed the defendants' preliminary objections, and the parties had not yet reached the conclusion of even the pleadings stage of litigation. This marked the beginning of a long litigation road that was likely to be drawn out by an appeals process once trial and post-trial motions had been completed. Cf. *In re Ikon Office Solutions Inc. Sec. Litig.,* 194 F.R.D. 166, 179 (E.D. Pa. 2000) ("[T]he extremely large sums of money at issue almost guarantee that any outcome, whether by summary judgment or trial, would be appealed."). Given the advanced age of many class members, the complexity and likely duration of litigation would unquestionably have taken a particularly heavy toll on the class in this action. Cf. *Hanson v. Acceleration Life Ins. Co.,* no. civ. A3-97-152, 2000 WL 33340298, at *4 (D.N.D. June 21, 2000) (noting that a lengthy litigation and appeals process would not be in the best interests of this elderly class). Accordingly, the likely length, complexity and expense of litigation of this matter support approval of the settlement.

### 5. *The state of the proceedings and the amount of discovery completed*

The purpose of the state of the proceedings and discovery completion factor is to ascertain the "degree of case development that class counsel have accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *General Motors Corp.,* 55 F.3d at 813. This ensures that "a proposed settlement is the product of informed negotiations" by

providing for "an inquiry into the type and amount of discovery the parties have undertaken." *Prudential II,* 148 F.3d at 319. See also, *In re Warner Communications Sec. Litig.,* 618 F. Supp. 735, 745 (S.D.N.Y. 1995), *aff'd,* 798 F.2d 35 (2d Cir. 1986) (approving class action settlement where "[d]iscovery [was] fairly advanced and the parties certainly [had] a clear view of the strengths and weaknesses of their cases").

From the filings presented to the court, class counsel has obviously engaged in extensive discovery and preparation, including a review of thousands of documents, depositions of key class members and consultation with experts and consultants. Discovery highlights, including significant portions of the defendants' document production, are set forth in the plaintiff's memorandum. This activity is amplified by the documents gathered in *Lane* and *Blau* and by class counsel's in-depth review of the law implicated by this case, as required by the myriad pretrial motions filed in this case and related cases. On this basis, the court can safely conclude that class counsel has collected sufficient information to make an informed decision as to the merits of the class's claims against the defendants.

### 6. *The recommendations of competent counsel*

It is difficult to overestimate the substantial weight courts have accorded the position taken by counsel for the class when evaluating a settlement. See *e.g., Williams v. Vukovich,* 720 F.2d 909, 922-23 (6th Cir. 1983) ("The court should defer to the judgment of experienced counsel who has competently evaluated the strength of his proofs."); *Austrian and German Bank,* 80 F. Supp.2d at

173-74 ("If the court finds that the settlement is the product of arm's-length negotiations conducted by experienced counsel knowledgeable in complex class litigation, the settlement will enjoy a presumption of fairness."); *Fischer v. Madway,* 336 Pa. Super. 289, 297, 485 A.2d 809, 813 (1984) ("The opinion of experienced counsel is entitled to considerable weight" when considering proposed class action settlement.). Cf. *In re Amer. Bank Note Holographics Inc.,* 127 F. Supp.2d 418, 429-30 (S.D.N.Y. 2001) ("An allocation formula need only have a reasonable, rational basis, particularly if recommended by 'experienced and competent' class counsel."). This emphasis is predicated on a number of considerations:

"The particular weight attributed to the recommendation of counsel depends on several factors—length of involvement in the case, competence, experience in the particular type of litigation, and amount of discovery completed. Usually, however, an evaluation of all the criteria leads courts to conclude that the recommendation of counsel is entitled to great weight following arm's-length negotiations by counsel who have the experience and ability . . . necessary for effective representation of the class's interests." *Austin v. Pennsylvania Department of Corrections,* 876 F. Supp. 1437, 1472 (E.D. Pa. 1995). (citations, brackets and quotation marks omitted)

The competence, experience and involvement of class counsel, as well as the expansive discovery undertaken in this case, have been discussed elsewhere and militate in favor of treating class counsel's opinion with great deference. Thus, class counsel's recommendation of the settlement supports an order decreeing its approval.

### 7. The reaction of the class to the settlement

It has been stated that a class's reaction "is perhaps the most significant factor to be weighed in considering its adequacy. . . ." *In re Microstrategy Inc. Sec. Litig.,* 150 F. Supp.2d 896, 905 (E.D. Va. 2001) (citing *Sala v. National R.R. Passenger Corp.,* 721 F. Supp. 80, 83 (E.D. Pa. 1989). This importance was stressed in *Dauphin I:*

"*Buchanan* requires that a court know the class members' reaction to the proposed settlement in advance of making a determination as to the 'reasonableness' of the plan. Thus, of necessity, class members must disclose their views (pro or con) prior to the court assessing the merits of any settlement offer. Anything less would foster abuse by class members in refraining from participating in the suit until the outcome, whether favorable or unfavorable, appears ascertainable." 698 A.2d at 1308. (footnote omitted)

The purpose of examining the reaction of the class to the proposed settlement is "to gauge whether members of the class support the settlement." *In re Safety Components Inc.,* 166 F. Supp.2d at 85 (quoting *Prudential II,* 148 F.3d at 318). (quotation marks removed) See also, *Bussie v. Allmerica Fin. Corp.,* 50 F. Supp.2d 59, 77 (D. Mass. 1999) (suggesting that a court should "review[] the objectors' stated concerns generously, as it would those presented by any pro se litigant"). Courts considering a class's response to a settlement proposal look not only at the merit of the objections raised, but also at "the number and vociferousness of the objectors." *Neuberger v. Shapiro,* 110 F. Supp.2d 373, 378 (E.D. Pa. 2000) (quoting *In re General Motors Corp.,* 55 F.3d at 812). (quota-

tion marks omitted) See also, *NASDAQ Market-Makers,* 187 F.R.D. at 478 ("The small number of objections necessarily must be evaluated relative to the size of this class of over 1.0 million members."). However, even where there is some resistence to the settlement among class members, including opposition from the named plaintiff, a court may nevertheless grant its approval to the settlement. *Brotherton v. Cleveland,* 141 F. Supp.2d 894, 906 (S.D. Ohio 2001) ("The fact that some class members object to the settlement does not by itself prevent the court from approving the agreement."); *Heit v. Van Ochten,* 126 F. Supp.2d 487, 494 (W.D. Mich. 2001) (citing *Laskey v. International Union, United Auto., Aerospace and Agr. Implement Workers of Amer. (UAW),* 638 F.2d 954, 957 (1981), for the proposition that "accepting a settlement over the objections of the named representatives is not necessarily an abuse of discretion"); *Martens v. Smith Barney Inc.,* 181 F.R.D. 243, 265 (S.D.N.Y. 1998) ("settlements can be approved over the preferences of original plaintiffs, because a contrary view would put too much power in a wishful thinker to thwart a result that is in the best interests of others.").

In another instructive warning, the *Dauphin I* court, in reversing the trial court's rejection of the settlement, noted the small number of objectors and spurned the objectors' explanation as to why more class members had not filed objections:

"The court makes much of the *objectors' account* of why more than 89 in number failed to take formal action to contest the proposed settlement, *e.g.,* lack of legal education impaired understanding of the terms and con-

ditions of the settlement and prospects of initiating independent litigation if settlement not accepted restrained potential objectors. See *Fischer, supra* (relevant to approving proposed settlement that only 14 of a class of approximately 1,000 members chose to object).

"We find unpersuasive and improper *reliance upon the comments of the objectors* at the June 21, 1996 hearing to approve settlement as pure hearsay as to why other members of the class failed to come forward to voice their complaints. The class members were represented by experienced and competent counsel ready, willing and able to discuss with class member questions concerning any facet of the litigation. The protestations that the content of the notices of settlement were incomprehensible (even after receiving approval by the court for distribution), when the class had counsel available to inform and advise if asked, rings hollow.

"Inhibitions to act, be they fanciful or real, have not been demonstrated to this court to be the product of a substantial and genuine percentage of the class members to assign any weight to the complaints proffered by the 89 objectors *on behalf of the absentee purported silent majority,* the reasons for which even the court observed were 'known only to the persons involved.' We may not speculate as to their absence nor will we assign any credence to those who wished to speak (and object) in their stead." 698 A.2d at 1310. This serves as a note of caution to any court that would draw extensive inferences from a class's silence as to their displeasure with a proposed settlement. If anything, a court should interpret a failure to respond to notice of settlement as approval of the settlement. See *Neuberger,* 110 F. Supp.2d

at 378 ("Courts have generally assumed that silence constitutes tacit consent to the agreement.").

As mentioned *supra,* the fewer than 5,200 class members who have filed objections or opted out of the settlement are dwarfed by the 85,000 forms that were returned by class members and represent an infinitesimal fraction of the class members to whom notice was sent. When the class members returning forms and the silent, and presumably content, class members are added together, they amount to more than 99 percent of the class. This indicates strong class support for the settlement.

Almost all of the objections raised mirror the court's original concerns and have been addressed elsewhere in this opinion. The only significant objections not refuted elsewhere go to the adequacy of the notice and the timing of the final hearing. Specifically, class members have objected to the impediments to obtaining information characterized as essential, the timing of the response deadline and the final hearing, and difficulties in understanding the notice. Each of these objections is without merit.

The first and last of the three objections can be addressed together, as one asserts that the class members did not have enough information, while the other essentially contends that the class members received too much information. Given these conflicting objections, it is difficult to know what type of notice would satisfy these latter-day Goldilocks class members as being "just right."

In *Fischer,* the Pennsylvania Superior Court discussed the requirements for the contents of notice in a class action:

"Notice in a class suit must present a fair recital of the subject matter and proposed terms and inform the class members of an opportunity to be heard. . . . It may consist of a very general description of the proposed settlement, including a summary of the monetary or other benefits that the class would receive and an estimation of attorneys' fees and other expenses. . . . The notice need not provide a complete source of settlement information, and class members are not expected to rely upon the notices as such.

"We hold, therefore, that a settlement notice is not rendered inadequate merely because it does not contain an estimate of the maximum damages potentially recoverable. . . . It is enough that the notice contain facts sufficient to alert interested persons to the terms of the proposed settlement and also the means by which further inquiry can be made and objection recorded." 336 Pa. Super. at 293-94, 485 A.2d 809, 811. (citations and quotation marks omitted) See also, *Gersenson v. Pennsylvania Life & Health Insurance Guaranty Association*, 729 A.2d 1191, 1196 (Pa. Super. 1999) ("[T]he measure of class member notice must necessarily focus on what is practicable under the circumstances.").

In this instance, the parties sent a copy of the seven-page notice to more than 750,000 class members for whom addresses were available. The notice spells out the basic terms of the settlement in as plain and as direct language as possible, including the following:

• The date, time and location of the final hearing;

• The date by which the forms and objections must be sent and/or received and the address to which all forms and objections were to be sent;

- The terms of the settlement, including summaries of the available benefits;

- A definition of the class;

- The text of the release;

- An estimate of attorneys' fees and lead plaintiff compensation; and

- Alternative modes for requesting additional information about the settlement.

The objections contending that the notice includes too much detail are unpersuasive. While a handful of class members may have found the background of the action and the settlement as set forth in the notice unnecessary and/or confusing, the court believed and continues to believe that such information was important if class members were to understand the context in which the settlement should be examined.[34]

On the opposite side, certain class members and their attorneys argued that the notice was insufficient and requested additional information beyond that set forth in the notice, including access to all discovery taken since class counsel began working on this matter in 1999. Similar such requests have been held to be within the discre-

34. Several objectors have contended that there are potential tax consequences of replacing a policy that are not addressed in the notice. Essentially, premiums paid on a tax qualified long-term care policy may be deductible, while premiums on other policies may not be. Policies purchased before January 1, 1997 are grandfathered in as tax qualified, and a replacement policy issued now may be non-qualified. However, the plaintiffs have the option of choosing a tax qualified policy, and the replacement policy brochure advises purchasers to seek the advice of a tax professional. This removes this objection from being a concern.

tion of the trial court and have been routinely denied by courts examining class action settlements. See *e.g., In re Lorazepam & Clorazepate Antitrust Litigation,* nos. MDL 1290(TFH) & 99MS276(TFH), 2001 WL 1335702, at *2 (D.D.C. Sept. 4, 2001) (denying individual class member's request to engage in additional discovery); *Prudential I,* 962 F. Supp. at 563 ("[O]bjectors have no absolute right to take independent discovery to prepare for a fairness hearing."). Cf. *NASDAQ Market-Makers,* 182 F.R.D. at 71-72 (exercising discretion to allow individual class member access to discovery materials). Here, allowing each requesting class member access to the documents and information amassed by class counsel would throw the settlement process into chaos, and the additional expenses incurred could ultimately be detrimental to the class as a whole.[35]

---

35. The court also received several petitions from class members seeking to intervene in this matter. The right of a class member to intervene in an action in which the member is already involved is limited:

"A party cannot intervene as of right if another party in the litigation adequately represents its interests. There is a presumption of adequate representation when the persons attempting to intervene are members of a class already involved in the litigation or are intervening only to protect the interests of class members. A difference of opinion concerning litigation strategy or individual aspects of a remedy does not overcome the presumption of adequate representation." *Jenkins v. Missouri,* 78 F.3d 1270, 1275 (8th Cir. 1996). (citations omitted) See also, *Vollmer v. Publishers Clearing House,* 194 F.R.D. 637, 638 (S.D. Ill. 1999), *aff'd in relevant part,* 248 F.3d 698 (7th Cir. 2001) (denying class member's petition to intervene because the proposed intervenors' interests were adequately represented by existing parties); *NASDAQ Market-Makers,* 187 F.R.D. at 491 ("Presumptively, class members are adequately represented by the existing class representatives.").

Any objections attacking the notice are further undermined by the fact that the notice was not the only manner in which the class was made aware of or could obtain information regarding the settlement. In the November order, the court directed that the hotline and the website be set up to provide the class with additional information not included in the notice and that an advertisement be published in *USA Today* on December 28, 2001. The effectiveness of these media is evident from the 237,000 hits on the website[36] and the 79,268 telephone calls placed to the hotline, as well as the overwhelming response of the class by returning the forms. Thus, the notice did not provide either too much or too little information.

The notice complied with the Pennsylvania's requirements for class action settlement notice in timing as well,

---

Here, counsel for each of the petitioners was given an opportunity to raise their concerns regarding the settlement and is listed on the docket as an attorney in this matter. Given the rights accorded these petitioners' counsel, any petition to intervene is moot.

36. A number of objections contend that the internet is an inappropriate tool for notifying members of a class whose members are senior citizens. However, as highlighted by the defendants, conventional wisdom severely underestimates the number of older Americans who make use of computers and the internet. See *e.g.*, Richard Adler, Research About Older Adults and Computers: Report of a National Survey, 1996 (visited Feb. 28, 2002) <http://www.seniornet.org/php/default.php?PageID=5476&Version=0&Font=0>; Research on Senior's Internet and Computer Usage: Report of a National Survey (1998) (visited Feb. 28, 2002) <http://www.seniornet.org/php/default.php?PageID=5474&Version=0&Font=0>. See also, *Prince George Center Inc. v. U.S. Gypsum Co.,* 704 A.2d 141, 149 (Pa. Super. 1997) (approving of use of internet site to provide notice to class members).

in spite of the objections asserting otherwise.[37] In *Dauphin I,* for example, the court approved a settlement where notice was sent on an undisclosed date sometime after May 13, 1996, objections were due by June 15, 1996 and the hearing was conducted June 21, 1996. Similarly, in *Marshall v. Holiday Magic Inc.,* 550 F.2d 1173 (9th Cir. 1977), the Ninth Circuit held that the 26 days between the mailing of the notice and the deadline for opting out were sufficient. 550 F.2d at 1178. Here, the notice was sent to class members on December 27 and 29, 2001, opt-out notices were to be postmarked by January 22, 2002, and the forms were to be received by February 4, 2002. This provided class members with sufficient time to receive, to evaluate and to return the forms or any other communications they wished to send, especially given the leniency of the court in enforcing these deadlines.[38] Accordingly, the seventh factor of class reaction

---

37. The attorney general letter echoes these complaints and asks that the court solicit input from the National Association of Insurance Commissioners, the Consumers Union and the American Association of Retired Persons, and allow "a reasonable period of time" after the final hearing for comments from state insurance regulators and state attorneys general. Given that this opinion is being issued more than a month after the final hearing, there has been sufficient time for such comments, and none has been received.

38. Such lenient treatment is within the discretion of the court:

"We recognize that deadlines are an integral component of effective consolidation and management of the modern . . . class action. Yet rigid and unquestioned adherence to such limitations belies principles of equity and the court's role as a fiduciary in class actions when allowing a claimant participation in a settlement works no harm on the conduct of the proceedings and does not significantly prejudice the interests of the parties." *In re Orthopedic Bone Screw Prods. Liab. Litig.,* 246 F.3d 315, 316-17 (3d Cir. 2001) (citation omitted). See also, *Prince George Center Inc.,* 704 A.2d at 146-47 (It is within a

adds to the sentiment that the court should approve settlement.

In sum, while the settlement may seem inadequate when measured against the defendants' alleged conduct, this is not the proper yardstick to be used when evaluating the settlement. Instead, the court has reviewed the settlement in light of the seven factors mandated by the Pennsylvania Supreme Court and found that each of the factors weigh in favor of approval. Accordingly, the court has approved the settlement.

---

trial court's discretion to grant a belated request for exclusion from a class where the class member acted with "excusable neglect," as shown where he or she demonstrates "both good faith and a reasonable basis for not acting within the time provided for exclusion from the class."). While it is impossible to determine whether the filer of each late objection acted in good faith, the defendants suffer no prejudice from the court's consideration of the barely untimely objections, which do little more than reiterate the complaints voiced in earlier objections and have no substantial impact on the court's decision. Similarly, the motion to accept opt out nunc pro tunc of class members George H. and Patsy T. Cramer establishes with striking detail that the Cramers acted in good faith and have a reasonable basis for not responding by the deadline, and it appears that the defendants will suffer little, if any, prejudice if the court heeds their request. Thus, their motion is granted. Cf. *Orthopedic Bone Screw,* 246 F.3d at 322-23 (setting forth factors for consideration in extending deadline and reversing lower court's decision to exclude claimant from participation in class action settlement for failure to meet registration deadline); *Burns v. Elrod,* 757 F.2d 151, 155 (7th Cir. 1985) (holding that courts should exercise their discretion to permit the filing of late claims "only when the equities, on balance, favor claimants" and denying petitions to file late claims where they were filed more than 19 months after the deadline).

## II. *The Court Has Approved Class Counsel's Request for Attorneys' Fees*

Federal and Pennsylvania reporters teem with examples of cases in which courts have awarded attorneys' fees to counsel securing a benefit for a class, even before formal class action rules were instituted:

"Distribution of a fund is to be governed by equitable considerations. . . . The right to charge a fund with costs and expenses depends on whether the litigation in which the costs and expenses were incurred was in promotion of the interests of those eventually found to be entitled to the fund. . . . Money paid for such purposes was paid to promote the interests of all who are entitled to share in the fund, and should be borne by the fund." *Schwartz v. Keystone Oil Co.,* 164 Pa. 415, 418, 30 A. 297, 298 (1894). (citations omitted) See also, *In re Fine Paper Antitrust Litigation,* 751 F.2d 562, 596 (3d Cir. 1984) ("[T]he burden is on the fee applicant in an equitable fund case to demonstrate to the court's satisfaction that the work for which compensation is sought benefitted the class."); *Fitzgerald v. City of Philadelphia,* 87 Pa. Commw. 482, 487, 487 A.2d 485, 488 (1985) (citing *International Organization Master, Mates & Pilots of America, Local No. 2 v. International Organization Masters, Mates & Pilots of America Inc.,* 497 Pa. 102, 439 A.2d 621 (1981), for the principle that "[o]ne must compensate his counsel in the absence of an express statutory authorization or some established exception"). Cf. *Pechner, Dorfman, Wolffe, Rounick & Cabot v. Insurance Dept. ex rel. Sheppard,* 46 Pa. Commw. 641, 407 A.2d 100 (1979) (denying attorneys' request for com-

pensation where action had not been certified as class action and favorably concluded to benefit of certified class). Given the work done by class counsel for the class, as well as the agreement of the defendants that an award of attorneys' fees is warranted, it is appropriate to award attorneys' fees to class counsel.

In awarding attorneys' fees in a class action, a court should estimate what the class would have paid for counsel's service, had negotiations with an awareness of what was to come been possible:

"The object in awarding a reasonable attorney's fee, as we have been at pains to stress, is to give the lawyer what he would have gotten in the way of a fee in an arm's-length negotiation, had one been feasible. In other words the object is to simulate the market where a direct market determination is infeasible. It is infeasible in a class action because no member of the class has a sufficient stake to drive a hard–or any–bargain with the lawyer. So the judge has to step in and play surrogate client." 962 F.2d 566, 572 (7th Cir. 1992).

Pa.R.C.P. 1716 sets forth a set of factors, among others, to be considered when an award of attorneys' fees is appropriate in a class action:

"(1) the time and effort reasonably expended by the attorney in the litigation;

"(2) the quality of the services rendered;

"(3) the results achieved and benefits conferred upon the class or upon the public;

"(4) the magnitude, complexity and uniqueness of the litigation; and

"(5) whether the receipt of a fee was contingent on success."

In addition to this five-factor test, courts in Pennsylvania and elsewhere have used two other methods for evaluating a proposed award of attorneys' fees: the lodestar method and the percentage of recovery method. courts will often use more than one method to ensure that an award that would be acceptable under one approach is not entirely inappropriate under another approach.[39] Under each of these three approaches, the attorneys' fees requested by class counsel are reasonable.

## A. The Proposed Attorneys' Fees Meet the Requirements of Rule 1716

Although there is a dearth of Pennsylvania law case on Rule 1716, the factors are relatively straightforward and easy to apply. Each of these factors weigh in favor of a sizeable award of attorneys' fees to class counsel.

### 1. *Time and effort reasonably expended by the attorney in the litigation*

There is no question that class counsel has expended a great deal of time and effort on this matter. Class counsel in this matter, which consisted of Allan Kanner &

---

39. The Third Circuit has stated that "it is sensible for a court to use a second method of fee approval to cross check its conclusion under the first method," even if one method or another is better suited to the type of action in question. *General Motors Corp.,* 55 F.3d at 820. But see *In re Intelligent Elecs. Inc. Sec. Litig,* no. 92-CV-1905, 1997 WL 786984, at *9 (E.D. Pa. Nov. 26, 1997) ("[I]n 'common fund' cases, . . . the preferred, if not mandated, method of calculating attorney fees is the percentage of recovery method."); Monique LaPointe, note, *Attorney's Fees in Common Fund Actions,* 59 Fordham L. Rev. 843 (1991) (arguing that courts should adopt either the lodestar or the percentage of recovery method).

Associates, P.C., Greitzer and Locks, Perry Pearce Benton, and Kolodny and Pressman, spent over 5,500 hours and approximately $150,000 in expenses, 16 months of litigation and nine months of settlement discussions. Kanner aff. ¶¶47-48. These efforts included contacts with and travel to state departments of insurance, collecting and reviewing documentation, interviewing potential lead plaintiffs and class members, meeting with experts and witness, drafting settlement documents and pleadings and providing telephone assistance to class members. *Id.* ¶50.

### 2. *Quality of the services rendered*

Again, the quality of the legal representation provided by class counsel is exceptional. The extensive experience of each of the firms and individual attorneys serving the class is set forth in Kanner affidavit paragraphs 54 through 68. Moreover, the court can attest to class counsel's professionalism and skill, as demonstrated by the extensive memoranda of law and the first-class oral arguments delivered on behalf of the class.

### 3. *Results achieved and benefits conferred upon the class or upon the public*

The relative worth of the settlement to the class has been discussed extensively *supra.* In addition to the settlement's specific awards, it is not difficult to infer that the media coverage of this case has drawn attention to the potential for improper pricing and other fraudulent conduct in issuing long-term health care and home health care policies. To the extent that such practices are found elsewhere in the insurance industry, it may prove

to be a boon for consumers nationwide. This benefit to the public is difficult to assess, but is certainly not negligible.

### 4. *Magnitude, Complexity and Uniqueness of the Litigation*

This case is one of enormous magnitude and is intricate, complex and nearly unique. The importance of this case is readily apparent from the size of the class and the possible impact on the insurance industry as a whole. Similarly, the subtleties of insurance laws across the United States provided a complicated canvas for the fashioning of a nationwide legal claim. Moreover, other than the parallel actions being settled in conjunction with this one, this action appears to be only the second one of its kind filed anywhere in the country,[40] and there have been few copy-cat actions filed elsewhere, whether against the defendants or otherwise.

### 5. *Whether the receipt of a fee was contingent on success*

The risk to class counsel in this matter was great, as receiving attorneys' fees was entirely contingent on a successful outcome of the litigation. This risk was magnified by the novelty of both the class' claims and the defenses arrayed against them. Were class counsel to fail on perhaps even one of these challenges, the result would

---

40. The first such action was *Hanson v. Acceleration Life Insurance Co.,* decisions in which can be found at 2000 WL 33340298 (D.N.D. June 21, 2000) (certifying class for settlement purposes and approving settlement), and 1999 WL 33283345 (D.N.D. Mar. 16, 1999) (addressing motions for summary judgment and certifying class).

be no compensation for the class or class counsel and a list of expenses that had accrued in the course of prosecuting the class' claims. Thus, each of the factors in Rule 1716 weighs in favor of a sizeable award of attorneys' fees to class counsel.[41]

## B. The Proposed Attorneys' Fees Are Appropriate Under the Lodestar Method

The lodestar method of calculating attorneys' fees is frequently used in federal class actions. Under this approach, "[t]he initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate. Adjustments to that fee then may be made as necessary in the particular case." *Blum v. Stenson,* 465 U.S. 886, 888 (1984) (citing *Hensley v. Eckerhart,* 461 U.S. 424 (1983)). The reasons for using this approach were enunciated in *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546 (1986):

"A strong presumption that the lodestar figure—the product of reasonable hours times a reasonable rate—represents a 'reasonable' fee is wholly consistent with the rationale behind the usual fee-shifting statute, including the one in the present case. These statutes were not designed as a form of economic relief to improve the financial lot of attorneys, nor were they intended to replicate exactly the fee an attorney could earn through a private fee arrangement with his client. Instead, the aim

---

41. The court also posits that the agreement of the defendants to the proposed amount of attorneys' fees through arm's-length negotiations is an "other factor" that can be considered in the context of a Rule 1716 analysis.

of such statutes was to enable private parties to obtain legal help in seeking redress for injuries resulting from the actual or threatened violation of specific federal laws. . . .

"Moreover, when an attorney first accepts a case and agrees to represent the client, he obligates himself to perform to the best of his ability and to produce the best possible results commensurate with his skill and his client's interests. Calculating the fee award in a manner that accounts for these factors, either in determining the reasonable number of hours expended on the litigation or in setting the reasonable hourly rate, thus adequately compensates the attorney, and leaves very little room for enhancing the award based on his post-engagement performance. In short, the lodestar figure includes most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee, and it is unnecessary to enhance the fee for superior performance in order to serve the statutory purpose of enabling plaintiffs to secure legal assistance." 478 U.S. at 565-66.

For these reasons, the lodestar figure has "become the guiding light of our fee-shifting jurisprudence," and the United States Supreme Court has established "a strong presumption that the lodestar represents the reasonable fee, and [has] placed upon the fee applicant who seeks more than that the burden of showing that such an adjustment is *necessary* to the determination of a reasonable fee." *City of Burlington v. Dague,* 505 U.S. 557, 562 (1992) (quoting *Delaware Valley,* 478 U.S. at 565, and *Blum,* 465 U.S. at 898).

While no Pennsylvania court has made use of the lodestar approach in a class action, this method has been

employed in other types of Pennsylvania cases where attorneys' fees are awarded:

"The calculation of a reasonable fee should begin with the actual number of hours spent in pursuing the claim multiplied by a reasonable rate. Both the number of hours and the rate per hour shall be calculated on a basis reasonably reflective of the relevant market and the magnitude, complexity and uniqueness of the claim and the related task.

"The court may also consider the discretionary application of a fee enhancement to reflect the contingent risk of the particular . . . claim at issue. A contingent risk enhancement, however, shall be inappropriate where the factors creating the risk have been mitigated or already taken into account in the calculation of number of hours times fee per hour. Additionally, fee recovery may include the reasonable fees incurred in the preparation and litigation of the fee petition if the client retains a material interest in the fee litigation." *Birth Center v. St. Paul Companies Inc.,* 727 A.2d 1144, 1160-61 (Pa. Super. 1999), *aff'd,* 567 Pa. 386, 787 A.2d 376 (2001). (footnotes omitted) See also, *Jones v. Muir,* 511 Pa. 535, 551, 515 A.2d 855, 864 (1986) ("[T]he method of determining a fee for legal services provided on an hourly basis is to multiply the total number of hours expended by the reasonable hourly rate. . . . [A] court can increase or decrease the lodestar fee in light of the contingencies involved and the quality of the work performed."); *Logan v. Marks,* 704 A.2d 671, 674 (Pa. Super. 1997) (determining the lodestar by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate and stating that the lodestar is "strongly pre-

sumed to yield a reasonable fee"); *Commonwealth, Department of Environmental Resources v. PBS Coals Inc.,* 677 A.2d 868, 874 (Pa. Commw. 1997) (stating that "[o]ur United States Supreme Court has noted that the lodestar approach is used for all federal fee-shifting statutes" and applying lodestar approach to award attorneys' fees to intervenors in state environmental suit).

Applying the lodestar method here yields an initial estimate of $1.5 million in class counsel's fees, not including $150,000 in expenses. Kanner aff. ¶48. Given that class counsel spent 5,500 hours working on this case,[42] this appears to be a reasonable initial value. Cf. *Prudential II,* 148 F.3d at 340 (approving lodestar based on an average hourly rate of $1,148.70); Weiss, 899 F. Supp. at 1304 (awarding counsel fees based on an average hourly rate of $2,779.63); *Gross v. City of Pittsburgh,* 741 A.2d 234, 240 (Pa. Commw. 1999) (approving award in inverse condemnation action based on hourly rate of $220).

The court believes that this initial figure merits upward adjustment. A 1985 Third Circuit task force set forth the following factors to be considered when adjusting the initially determined attorneys' fees:

"[T]he task force feels that the contingency factor, which it defines simply as 'the risk of winning or losing,' should be considered in all cases. Plaintiffs' attorneys always face the prospect of receiving no compensation in statutory fee cases. Accordingly, even modest risks in cases in which liability is reasonably certain to be established should be recognized in the fee-setting process.

---

42. This would result in an average hourly rate of $272.72.

"Other factors that the task force thought should be considered in adjusting the basic fee are: (1) the result obtained in the action; (2) the petitioning attorney's contribution to a prompt or a delayed resolution of the action; and (3) the delay in receiving attorneys' fees. The second factor is designed to encourage early settlement by providing an incentive that neutralizes an attorney's possible predilection to increase the number of hours invested in a case for lodestar purposes. As to the third factor, which is designed to recognize the economic effects of a delay in receiving attorneys' fees, the court either may use a multiplier or may make an award to the attorney under the current scheduled hourly rate rather than the one in force when the work actually was done. An award of interest at an appropriate rate also could be employed to compensate for a delay in payment." *Court Awarded Attorneys' Fees: Report of the Third Circuit Task Force,* 108 F.R.D. 237, 265 (1985). (footnotes omitted) The high risk of bringing this action, including the fact that this case was brought on a contingency basis, as well as the relief obtained for the class and class counsel's involvement in and contribution to settlement negotiations, are discussed elsewhere in this opinion and support the application of a considerable multiplier.

The proposed award of attorneys' fees to class counsel is three times the value of the services provided to the class. It is difficult to compare multipliers in different cases,[43] but courts have often found a multiplier of

---

43. It has been recognized that lodestar multipliers are by nature "discretionary and not susceptible to objective calculation." *Cullen v. Whitman Med. Corp.,* 197 F.R.D. 136, 150 (E.D. Pa. 2000) (quoting *Prudential II,* 148 F.3d at 340).

three or higher to be reasonable in a class action setting. See *e.g.*, *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp.2d 706, 736 n.44 (E.D. Pa. 2001) (approving multiplier "in the range of 4.5 to 8.5"); *Hinckley v. E.I. DuPont de Nemours & Co.*, 583 F. Supp. 11, 14 (E.D. Pa. 1983) (applying multiplier of 3.0 in securities violations case); Newberg §14.03 ("Multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied."). Cf. *Conley v. Sears, Roebuck & Co.*, 222 B.R. 181 (D. Mass. 1998) (approving award of attorneys' fees using multiplier of 8.9); *Muchnick v. First Fed. Sav. & Loan Ass'n*, civ. a. no. 86-1104, 1986 WL 10791 (E.D. Pa. Sept. 30, 1986) (approving award of attorneys' fees using multiplier of 8.33 where "[t]he lawsuit raised several significant and novel legal issues, and the history of related litigation indicated that the contest would likely be lengthy and hard-fought"). Here, class counsel makes the reasonable request that its $1.5 million in attorneys' fees be factored by a multiplier of 3.0 for a final amount of $4.5 million. Thus, the lodestar method supports awarding the attorneys' fees requested by class counsel.

### 3. Class counsel's request for attorneys' fees is reasonable using the percentage of recovery method

Under the percentage of recovery method, a court must first make a reasonable estimate the value of recovery made, including proposed fees, from which it can determine the relationship between the recovery and the attorneys' fees. *Prudential II*, 148 F.3d at 333 (citing *General Motors Corp.*, 55 F.3d at 822); *Weiss*, 899 F. Supp. at 1304. Awards of between 20 to 30 percent are quite common.

"No general rule can be articulated on what is a reasonable percentage of a common fund. Usually 50 percent of the fund is the upper limit on a reasonable fee award from a common fund, in order to assure that fees do not consume a disproportionate part of the recovery obtained for the class, though somewhat larger percentages are not unprecedented. In the normal range of common fund recoveries in securities and antitrust suits, common fee awards fall in the 20 to 30 percent range. This fee percentage would often be higher on a proportional basis for modest recoveries because of the larger ratio of hours to recovery amount that would likely be involved. On the other hand, the fee percentage would be significantly more modest as the common fund recovery begins to reach recoveries approaching or exceeding $100 million, based on the notion that the effort necessary to achieve recovery dollars at the high end was less onerous, on a sliding scale, than the effort expended for recovering the threshold sums by judgment or settlement." Newberg §14.03. (footnotes omitted) See also, *In re Ikon Office Solutions,* 194 F.R.D. 166 (approving attorneys' fees of 30 percent of settlement); *In re Bioscience Sec. Litig.,* 155 F.R.D. 116 (E.D. Pa. 1994) (same); *In re Warner Communications,* 618 F. Supp. 735, 749 (S.D.N.Y. 1984) ("Traditionally, courts in this circuit and elsewhere have awarded fees in the 20 percent-50 percent range in class actions."). Courts have weighed the percentage of recovery against a set of seven factors:

"(1) the size of the fund created and the number of persons benefitted;

"(2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel;

"(3) the skill and efficiency of the attorneys involved;

"(4) the complexity and duration of the litigation;

"(5) the risk of nonpayment;

"(6) the amount of time devoted to the case by plaintiffs' counsel; and

"(7) the awards in similar cases." *Cullen,* 197 F.R.D. at 147 (citing *Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190, 201 n.6 (3d Cir. 2000)). These factors have been analyzed elsewhere in this opinion and support a relatively high percentage of recovery award.

Here, class counsel's request amounts to approximately 7.7 percent of the $34.7 million settlement. This is well within the range of awards authorized under the percentage of recovery method and far below the 30 to 40 percent contingency fee agreed to by each of the class representatives. Kanner aff. ¶53. Cf. *Pavlidis v. New England Patriots Football Club Inc.,* 675 F. Supp. 707 (D. Mass. 1987) (considering contingent fee agreement when awarding attorneys' fees). Because the $4.5 million in fees requested is appropriate under each of the methods set forth above, class counsel's request for attorneys' fees is approved.

### III. *The Incentive Awards for the Class Representatives Are Approved*

The parties have pointed to no Pennsylvania state appellate court-made case law on incentive awards to class representatives, and the court's research has yielded no state court decisions on the subject. However, allowing a financial incentive to class representatives is becoming increasingly common, and numerous federal deci-

sions provide extensive guidance as to when awards are warranted and in what amounts. After examining these decisions, the court finds that the awards requested for the class representatives are appropriate.

There are a number of valid reasons for granting class representative awards:

"The plaintiff's role in these cases is to protect the interests of the class and foot the bill for litigation. However, the public policy favoring private civil litigation as a means to promote certain important social values often fails to provide adequate compensation or incentive for plaintiffs to take on this burden simply on principle. The representative assumes substantial risk, not just of losing the time and costs of litigation, but also of retaliation or collateral notoriety. . . .

"In general, class representatives are entitled to reimbursement of expenses if the suit is successful, but not compensation for their services. In addition, the named plaintiff is a party to the litigation and not a witness, and so cannot be compensated for witness fees or travel expenses incurred in giving a deposition during discovery." Clinton A. Krislov, *Scrutiny of the Bounty: Incentive Awards for Plaintiffs in Class Litigation,* 78 Ill. B.J. 286, 286 (1990). (footnotes omitted) In part for these reasons, incentive awards "are not uncommon in class action litigation and particularly where . . . a common fund has been created for the benefit of the entire class." *Cullen,* 197 F.R.D. at 145. (citation and quotation marks omitted) See also, *In re S. Ohio Correctional Facility,* 175 F.R.D. 270, 272 (S.D. Ohio 1997) ("Courts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they in-

curred during the course of the class action litigation."); Sofia C. Hubscher, *Making It Worth Plaintiff's While: Extra Incentive Awards To Named Plaintiffs In Class Action Employment Discrimination Lawsuits,* 23 Colum. Hum. Rts. L. Rev. 463, 477-486 (1992) (arguing in favor of incentive awards).

Whether to grant incentive awards is in the discretion of the trial court. *Montgomery v. Aetna Plywood Inc.,* 231 F.3d 399, 408 (7th Cir. 2000), *cert. denied,* 532 U.S. 1038 (2001); *Southern Ohio Correctional Facility,* 175 F.R.D. at 276. (citation omitted) In determining whether to grant an award and the size of such awards, courts have relied on five factors:

"(1) the risk to the class representative in commencing suit, both financial and otherwise; (2) the notoriety and personal difficulties encountered by the class representative; (3) the amount of time and effort spent by the class representative; (4) the duration of the litigation and; (5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation." *Van Vranken v. Atlantic Richfield Co.,* 901 F. Supp. 294, 299 (N.D. Cal. 1995) (citing, inter alia, Richard Greenfield, "Rewarding the class representative: An Idea Whose Time Has Come," 9 Class Action Reports 4 (1986), and authorizing $50,000 incentive award for class representative).[44] Depending on the involvement of the class rep-

---

44. Other courts have relied on three factors, the essence of which are subsumed in the *Van Vranken* factors:

"(1) the action taken by the class representatives to protect the interests of class members and others and whether these actions resulted in a substantial benefit to class members; (2) whether the class representatives assumed substantial direct and indirect financial risk; and (3) the amount of time and effort spent by the class representatives in

resentative, courts, including federal courts sitting in Pennsylvania, have allowed incentive awards in substantial amounts. See *e.g., In re SmithKline Beckman Corp. Sec. Litig.,* 751 F. Supp. 525 (E.D. Pa.1990) (approving award of $5,000 to each of several class representative); *In re First Jersey Sec. Inc. Litig.,* MDL no. 681, 1989 WL 69901 (E.D. Pa. June 23, 1989) (approving award of $24,000 to class representative); *Bogosian v. Gulf Oil Corp.,* 621 F. Supp. 27 (E.D. Pa.1985) (approving award of $20,000 to each of two class representative). Cf. *In re U.S. Bioscience,* 155 F.R.D. 116 (holding that awards of $2,500 to majority of representatives and $5,000 to deposed representatives were inappropriate where representatives had borne little risk by participating in litigation and provided services that could have been provided by any other class member).

This is not to say that payments to class representatives are without their opponents:

"The threshold question is whether a named plaintiff is ever entitled to a fee. The basis for an award of fees in a common-fund case is, as we said, restitutionary, and the law of restitution (excepting salvage in admiralty) generally confines the right to restitution to professionals, such as doctors and lawyers. If you dive into a lake and save a drowning person, you are entitled to no fee.

---

(3) the amount of time and effort spent by the class representatives in pursuing the litigation." *Enterprise Energy Corp. v. Columbia Gas Transmission Corp.,* 137 F.R.D. 240, 250 (S.D. Ohio 1991) (authorizing incentive awards of $50,000 for each class representative). See also, *Spicer v. Chicago Bd. Options Exch. Inc.,* 844 F. Supp. 1226, 1266 (N.D. Ill. 1993) (relying on three factors to approve $10,000 incentive awards for each class representative).

The named plaintiff is not a professional; he is, at most, a public-spirited member of the class. Yet the usual formulations of the common-fund doctrine describe the plaintiff rather than his lawyer as the person entitled to be compensated for the expenses he has incurred in conferring a benefit on the (other) beneficiaries of the common fund." *In the Matter of Continental Ill. Sec. Litig.,* 962 F.2d 566, 571 (7th Cir. 1992). (citations omitted) See also, *U.S. Bioscience,* 155 F.R.D. at 121 ("The practice of approving incentive awards has recently attracted what seems to us to be trenchant and persuasive criticism."); *Weseley v. Spear, Leeds & Kellogg,* 711 F. Supp. 713, 720 (E.D.N.Y. 1989) ("A class representative is a fiduciary to the class. If class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard.").[45] This opposition has led to an often reluctant acceptance of incentive awards with a placement of qualifying limitations on such awards:

---

45. To the extent that courts wary of incentive awards fear that incentive awards will be drawn from a common class fund and thereby diminish the recovery of other class members, the court notes that the benefits provided under the settlement are neither affected nor reduced by the awards made to the class representatives. Cf. *Rivera v. Fair Chevrolet Geo Partnership,* 68 F.R.D. 11, 12 (D. Conn. 1996) (finding that class representative's interests were not antagonistic to those of the class where incentive award was separate and distinct from general fund to be divided among class members); *Lovell v. Evergreen Resources Inc.,* no. C-88-3467 DLJ, 1995 WL 761269, at *7 (N.D. Cal. Dec. 15, 1995) ("[T]he relatively small amount of money available for distribution in this case renders the requested award inequitable.").

"Awards to named plaintiffs are appropriate compensation for the time and expense they incur in serving as class representatives. The consumers who fight on behalf of an entire class should be reasonably compensated for their efforts when those efforts are successful. For anything more than modest sums in the range of $2,000-3,000, the amounts of such awards should be based on the amount of time and money expended in connection with prosecuting the case, or other special circumstances." *Standards and Guidelines,* 176 F.R.D. at 387. See also, *In re Synthroid Mktg. Litig.,* 264 F.3d 712, 722 (7th Cir. 2001) ("Incentive awards are justified when necessary to induce individuals to become named representatives."); Manual for Complex Litigation §30.47 ("Although these payments, commonly called 'incentive awards,' are generally inconsistent with the philosophy that similarly-situated class members are treated equally, they are often approved.").

In this case, class counsel has requested awards of $10,000 to each of Alva Lane and Linda Pequegnat, $7,500 to each of Janet Blau and Larry Blau, and $5,000 to Irene Milkman. These awards are based on the following:

"Alva Lane, she met with counsel to prepare. Alva Lane met with us to help draft the original complaint in her case. She is the San Diego plaintiff. She went and she gathered all of her paperwork.

"We went through it. She reviewed and edited the complaint. She edited interrogatories. She produced documents. Her deposition was taken. She continued to meet with class counsel thereafter.

"She received calls from class members who saw her name in the heading and we talked to her during the settle-

ment process. We had talked about the array of objections that we were creating [sic] for the class.

"She is a very intelligent woman. She has a Ph.D., which they forgot to ask her about at deposition, and but [sic] it was a vary [sic] hard deposition. I invite the court, well, and then Linda Pequegnat also went through depositions. She was on the Lane case as well. That was the case moving faster to trial. She basically did the same thing as Alva Lane.

"We asked for a little bit less each for Janet Blau and Larry Blau, $7,500. They were not deposed. They did everything that Pequegnat and Lane did except for their depositions. They received many more calls since their case had gotten a lot of attention in the press. They also ended up talking to class members.

"Irene Milkman, we are asking $5,000 and that reflects the fact that the Pennsylvania case had not moved as far forward as the other cases in terms of the level of work, responding to interrogatories, requests to produce documents, et cetera.

"They gave very generously of their time, both during the pre-suit process, during suit, during settlement negotiations, running out in the hall. . . . [W]e stayed in communication and these people have invested a lot and they have heard a lot of other people [sic] about the settlement." Tr. 53-55.

An analysis of these facts with the factors used by other courts supports the incentive awards requested. Each of the class representatives spent a great deal of time preparing for and prosecuting this action over the past two or more years. The frequent communications that the class representatives received from class members attest to the difficulties presented by being a named plaintiff in a

major nationwide class action suit. Moreover, the class representatives' incentive awards total less than 0.1 of the value of the settlement. Cf. *In re Lorazepam & Clorazepate,* nos. MDL 1290(TFH) and 99MS276(TFH), 2002 WL 246664, at \*27 (D.D.C. Feb. 1, 2002) (approving incentive awards representing approximately 0.3 percent of each class's recovery); *Dornberger v. Metropolitan Life Insurance Co.,* 203 F.R.D. 118, 124 (S.D.N.Y. 2001) (approving incentive awards that were "small" in relation to the value of the settlement reached). Accordingly, the court agrees to grant awards of $10,000 to each of Alva Lane and Linda Pequegnat, $7,500 to each of Janet Blau and Larry Blau, and $5,000 to Irene Milkman. Cf. *Bussie v. Allmerica Fin. Corp.,* no. civ. a. 97-40204-NMG, 1999 WL 342042, at \*4 (D. Mass. May 19, 1999) (approving $5,000 incentive award for each class representative where "the named plaintiffs have helped effectuate the policies underlying insurance regulation").

## CONCLUSION

Although the settlement does not provide all that the class requested in the complaint, it provides fair compensation in light of the class' strong support for the settlement, the risks and likely duration of continuing litigation and the thorough investigation and recommendations of class counsel. Likewise, both the attorneys' fees requested by class counsel and the incentive awards requested for the class representatives are within the range permitted by Pennsylvania law. Accordingly, the settlement and the accompanying requests are approved.